Lisa S. Kantor, State Bar No. 110678
  *lkantor@kantorlaw.net*
Timothy J. Rozelle, State Bar No. 298332
  *trozelle@kantorlaw.net*
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, CA 91324
Tel: (818) 886-2525; Fax: (818) 350-6272

Steven C. Dawson, Arizona State Bar No. 006674 (*pro hac vice pendin*g)
  *sdawson@dawsonandrosenthal.com*
Anita Rosenthal, Arizona State Bar No. 006199 (*pro hac vice pending*)
  *arosenthal@dawsonandrosenthal.com*
Dawson & Rosenthal, P.C.
25 Schnebly Hill Road
Sedona, AZ 86336
Tel: (928) 282-3111; Fax: (928) 282-3126

Sander R. Dawson, State Bar No. 302431
  *sander@dawsonandrosenthal.com*
Dawson & Rosenthal, P.C.
402 West Broadway, Suite 2100
San Diego, CA 92101
Tel: (619) 354-1652; Fax: (928) 282-3126

Attorneys for Plaintiffs, Dual Diagnosis Treatment Center, Inc.,
Satya Health of California, Inc., Adeona Healthcare, Inc.,
Sovereign Health of Florida, Inc., Sovereign Health of Phoenix,
Inc., Sovereign Health of Texas, Inc, Shreya Health of Florida,
Inc., Shreya Health of Arizona, Inc., Vedanta Laboratories, Inc.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

DUAL DIAGNOSIS TREATMENT
CENTER, INC., a California corporation;
SATYA HEALTH OF CALIFORNIA,
INC., a California corporation; ADEONA
HEALTHCARE, INC., a California
corporation; SOVEREIGN HEALTH OF
FLORIDA, INC., a Delaware corporation;
SOVEREIGN HEALTH OF PHOENIX,
INC., a Delaware corporation;
SOVEREIGN HEALTH OF TEXAS, INC.,
a Delaware corporation; SHREYA
HEALTH OF FLORIDA, INC., a Florida
corporation; SHREYA HEALTH OF
ARIZONA, INC. an Arizona corporation,
and VEDANTA LABORATORIES, INC., a
Delaware corporation,

    Plaintiffs,

    vs.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:

**COMPLAINT FOR**

1. **VIOLATION OF RICO, 18 U.S.C. § 1962(c)**

2. **CONSPIRACY TO VIOLATE RICE, 18 U.S.C. §1962 (d)**

3. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

4. **VIOLATION OF UNFAIR COMPETITION LAW**

5. **SLANDER**

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1   CENTENE CORPORATION, a Delaware )      **DEMAND FOR JURY TRIAL**
corporation; MICHAEL NEIDORFF, an )
2   individual; HEALTH NET LIFE )
INSURANCE COMPANY, a California )
3   corporation; MANAGED HEALTH )
NETWORK, INC., a Delaware corporation; )
4   LIANN GOHARI, an individual; )
KENNETH B. JULIAN, an individual; )
5   JOHN M. LEBLANC, an individual; )
ILEANA HERNANEZ, an individual; )
6   OPTUM SERVICES, INC., a Delaware )
corporation, )
7                                          )
                                           )
8              Defendants.                 )
   _____ )

9

10

11                          **PLAINTIFFS**

12      1.      Plaintiff Dual Diagnosis Treatment Center, Inc. ("Dual Diagnosis") is a

13   corporation organized and existing under the laws of California. Dual Diagnosis does

14   business as "Sovereign Health of California" and on occasion under other names as

15   permitted by law. Until July 2018, Dual Diagnosis operated and maintained mental

16   health and substance treatment facilities in California.

17      2.      Plaintiff Satya Health of California, Inc. ("Satya") is a corporation duly

18   organized and existing under the laws of California. Satya does business as "Sovereign

19   by the Sea II," and on occasion under other names as permitted by law. Until July

20   2018, Satya operated and maintained mental health treatment facilities in California,

21   providing detoxification treatment, residential treatment (RTC), partial hospitalization

22   program (PHP), intensive outpatient treatment (IOP), and outpatient treatment (OP).

23   Satya was licensed to treat patients with mental health and/or substance use disorders.

24      3.      Plaintiff Adeona Healthcare, Inc.  ("Adeona") is a corporation duly

25   organized and existing under the laws of California. Adeona does business as

26   "Sovereign Health Rancho/San Diego." Until July 2018, Adeona operated and

27   maintained mental health treatment facilities in El Cajon California, providing RTC,

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

PHP and IOP treatment for children ages 12 through 17. Adeona was licensed to treat patients with mental health and/or substance use disorders.

4.      Plaintiff Sovereign Health of Florida, Inc. ("Sovereign Florida") is a corporation duly organized and existing under the laws of Delaware. Until July 2018, Sovereign Florida operated and maintained a mental health treatment facility in Fort Myers, Florida, providing detox, RTC, PHP, IOP and OP treatment. Sovereign Florida was licensed to treat patients with mental health and substance use disorders.

5.      Plaintiff Sovereign Health of Phoenix, Inc. ("Sovereign Phoenix") is a corporation duly organized and existing under the laws of Delaware. Until July 2018, Sovereign Phoenix operated and maintained a mental health facility in Chandler, Arizona providing RTC, PHP, IOP and OP treatment.  Sovereign Phoenix was licensed to treat patients with mental health and/or substance use disorders.

6.      Plaintiff Sovereign Health of Texas, Inc. ("Sovereign Texas") is a corporation duly organized and existing under the laws of Delaware. Until July 2018, Sovereign Texas operated and maintained a mental health facility in El Paso, Texas providing detoxification treatment, RTC, PHP and IOP.  Sovereign Texas was licensed to treat patients with mental health and/or substance use disorders.

7.      Plaintiff Shreya Health of Florida, Inc. ("Shreya Florida") is a corporation duly organized and existing under the laws of Florida. Until July 2018, Shreya Florida was a billing entity for ancillary services rendered to patients treating at Sovereign Florida.

8.      Plaintiff Shreya Health of Arizona, Inc. ("Shreya Arizona") is a corporation duly organized and existing under the laws of Arizona. Until July 2018, Shreya Arizona was a billing entity for ancillary services provided to patients treating at Sovereign Phoenix.

9.      Vedanta Laboratories, Inc. ("Vedanta") is a corporation duly organized and existing under the laws of Delaware. Vedanta was authorized to provide laboratory services by COLA (formerly the Commission on Office Laboratory Accreditation), an

accreditation organization for clinical laboratories under the Clinical Laboratory Improvement Amendments (CLIA) program. Until July 2018, Vedanta conducted laboratory testing services for the plaintiffs.

10.     Collectively plaintiffs are referred to as "Sovereign" or "Plaintiffs."

## DEFENDANTS

11.     Defendant Centene Corporation ("Centene") is a corporation duly organized and existing under the laws of Delaware, and a Fortune 500 company, with its headquarters in St. Louis, Missouri.  Centene is the parent company of Health Net. Centene also has an office in Woodland Hills, California.

12.     Defendant Michael Neidorff ("Neidorff") is, and at all relevant times was, the CEO of Centene.

13.     Defendant Health Net Life Insurance Company ("Health Net") is a California corporation with its principal place of business at 21281 Burbank Boulevard, Building B3, Woodland Hills, California. Health Net sells individual health insurance policies in California.

14.     Defendant Managed Health Network, Inc. ("MHN") is a Delaware corporation with a principal place of business at 11931 Foundation Place, Building D, Rancho Cordova, California 95670.  MHN is the behavioral health subsidiary of Health Net.

15.     Defendant Liann Gohari ("Gohari") is Vice President and Deputy General Counsel at Health Net.

16.     Defendant Kenneth B. Julian ("Julian") is a partner at Orange County Office of Manatt, Phelps & Phillips, LLP ("Manatt"), a law firm which advertises itself as a "multidisciplinary, integrated national professional services firm," with offices in Los Angeles, Orange County, Palo Alto, San Francisco, Sacramento, New York, Albany, Chicago and Washington, D.C. Immediately prior to becoming a partner at

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1 | Manatt, Julian was a deputy chief in the Orange County office of the U.S. attorney for
2 | the Central District of California.

3 |     17.    Defendant John M. LeBlanc ("LeBlanc") is a partner at the Los Angeles
4 | Office of Manatt and a co-chair of the firm's national healthcare litigation practice.

5 |     18.    Defendant Ileana Hernandez ("Hernandez") is a partner at the Los
6 | Angeles Office of Manatt.

7 |     19.    Defendant Optum Services, Inc. ("Optum") is a Delaware corporation
8 | with its principal place of business at 11000 Optum Circle, Eden Prairie, Minnesota.
9 | Optum is a health services business serving the health care marketplace, including
10 | payers and health care providers, and provides shared claim handling and processing
11 | services. Optum sometimes operates as Optum and Optum Shared Solutions.

12 |     20.    Collectively Centene, Neidorff, Health Net, Gohari, Julian, LeBlanc,
13 | Hernandez and Optum are referred to as "Defendants."

## JURISDICTION AND VENUE

21. Jurisdiction is based on 18 U.S.C. §§1962, 1965 (Racketeer Influenced and Corrupt Organizations) and 28 U.S.C. § 1367 (Supplemental Jurisdiction).

22. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) and (c)(2). Health Net and MHN reside in this judicial district, all of the Defendants do business in this judicial district, and much of the conduct that is the subject of this lawsuit occurred within this judicial district.

## PLAINTIFFS WERE AWARD-WINNING
## MENTAL HEALTH PROVIDERS

23. Plaintiffs offered specialized treatment for mental health, substance abuse and dual diagnosis disorders for adults and adolescents. In operation from 2009 through 2018, Plaintiffs had nine licensed treatment facilities in five states and employed approximately twelve hundred (1,200) people in the United States, including

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

approximately sixty professionals with M.D. or PhD degrees.  Plaintiffs have treated thousands of patients across the country, with an independently verified track record of success which far exceeds the industry average.

24.     Plaintiffs' California facilities were licensed by the California Department of Healthcare Services (DHCS) since 2009 for detoxification and residential treatment and by the California Department of Social Services (DSS), since 2012, for Mental Health Treatment. Similarly, Plaintiffs' facilities in Arizona, Florida, Texas and Utah were licensed by the appropriate agencies for treatment of mental health and substance abuse disorders.

25.     Plaintiffs' approach to addiction and mental health treatment was consistent with best practices in the industry. Its facilities earned The Gold Seal of Approval from The Joint Commission, an independent not-for-profit organization that is the nation's oldest and largest standard setting and accrediting body in health care. The National Alliance of Mental Illness recognized Sovereign for providing "The Gold Standard for Mental Health Treatment for patients in Orange County and throughout the country." Studies conducted in 2016 and 2017 by Harvard Medical School Affiliate, McLean Hospital, consistently found that Plaintiffs' residential patients were up to two times sicker than those typically admitted to other accredited behavioral healthcare providers and that Plaintiffs' programs produced clinical outcomes up to three times better than these comparable institutions.

26.     Plaintiffs were widely recognized behavioral health educators. Since 2015, the American Psychological Association authorized Plaintiffs and their staff to train licensed doctoral psychologists. The California Board of Behavioral Health Sciences, the California Association of Alcohol/Drug Educators, the National Association of Alcoholism and Drug Abuse Counsel and the Association for Psychology, Post-Doctoral and Internship Centers approved Plaintiffs to provide continued education to licensed professionals in the substance abuse field. The University of Southern California sent its Master of Social Work students to receive

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1  training at Sovereign facilities. Plaintiffs also provided continued education to lawyers

2  for the substance abuse requirement of MCLE.

3      27.    In 2015, Plaintiffs received an offer to purchase their business for $625

4  million.

5      28.    At all relevant times, Plaintiffs were "out-of-network" health care

6  providers with respect to Health Net. In other words, none of the Plaintiffs contracted

7  with Health Net to provide mental health or substance use disorder treatment to

8  patients with Health Net health insurance at a discounted rate pursuant to what is

9  commonly referred to as an "in-network" contract.

10

11                            **HEALTH NET ENTERS THE ACA EXCHANGE**

12      29.    Effective 2014, the Affordable Care Act ("ACA") required health

13  insurance policies to provide ten categories of "essential health benefits," including

14  mental health and substance abuse treatment. 42 U.S.C. § 18022. In addition, under the

15  ACA, states established on-line "exchanges," where the new ACA-compliant policies

16  were marketed.

17      30.    In 2014, Health Net began marketing health insurance policies through

18  the exchanges.  At the time, the terms of Health Net's policies—designed to increase

19  Health Net's market share—required payment to out-of-network mental health facility

20  claims for inpatient, residential or outpatient treatment based on 75% or 100% of the

21  billed amount. In contrast, most health insurance policies offered through the

22  exchanges required payment to out-of-network mental health facility claims for

23  inpatient, residential or outpatient treatment at a significantly lower rate.

24      31.    Health Net had great success in the exchange market. In 2014 and 2015,

25  Health Net saw dramatic increases in the number of policyholders. As disclosed in

26  Health Net's SEC filings, enrollment in individual policies in Health Net's Western

27  Region increased 188.7 percent from year-end 2013 to year-end 2014, from

28  approximately 115,000 policyholders to 332,000 policyholders. In California alone,

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

enrollment increased 137.0 percent, from approximately 100,000 policyholders to 237,000 policyholders. According to Health Net, this significant increase was primarily due to an increase in new individual policyholders from the ACA exchanges in California and Arizona.

32.    Along with this huge increase in the number of policyholders, Health Net saw an even more dramatic increase in the number and dollar amount of claims. In its filings with the California Department of Insurance ("DOI"), Health Net disclosed that in 2014 it earned $233.5 million in premiums for California policies but incurred $345.5 million in claims, resulting in a loss of $112 million.  In the following year, 2015, Health Net earned $189 million in premiums, but incurred $473 million in claims, resulting in a loss of $284 million.

33.    The increase in the dollar amount of claims related to the treatment of substance abuse was particularly dramatic. According to Health Net's DOI filings, from 2014 to 2015 its *paid* substance abuse claims in California increased 1,577 percent. Out-of-network substance abuse claims alone accounted for 42.7 percent of all of Health Net's claims in California in 2015 (*i.e.,* $202,385,210 out of a total of $473,970,047). The number of out-of-network behavioral health claims, which include substance use disorder claims, were over 9,000 percent greater in 2015 than in-network behavioral health claims. Health Net attributed this difference solely to the fact that out-of-network claims were required to be paid at a percentage of billed charges rather than at the much lower negotiated rate it paid to in-network providers.

## HEALTH NET MERGES WITH CENTENE

34.    On July 2, 2015, Health Net announced that it had entered into a merger agreement with Centene under which Centene would acquire 100% of Health Net. In October 2015, Health Net's stockholders voted to approve the adoption of the merger agreement with Centene. When the deal was finalized, it was valued at $6.8 billion.

35.     In March 2016, the California DOI concluded its review of the merger and granted conditional approval, mandating that Centene keep Health Net's individual policies on Covered California (the exchange marketplace in California under the ACA), that Health Net ensure its networks of providers was adequate to meet the needs of its insureds, and that Health Net make efforts to improve its ratings on the "report card" issued to it by California Office of Patient Advocacy.

36.     Health Net's CEO received a golden parachute worth $54,000,000 and its CFO received a golden parachute worth $23,400,000. Neidorff received total compensation of approximately $20.75 million in 2015 and $21.97 million in 2016.

37.     In July 2016, after the effective date of its merger with Health Net, Centene could not long avoid disclosing to its shareholders that Health Net had incurred $390 million in liabilities, which existed as of the March 24, 2016 merger date, but had not been properly accounted for and disclosed. At least $140 million of the undisclosed liabilities related to substance use disorder claims in California. The increased liabilities were greater than Health Net's entire pre-tax annual earnings for any of the prior five years.

38.     In numerous public statements, Neidorff admitted that Centene knew about Health Net's liability prior to March 2016.  Centene admitted in public filings that Health Net's liability existed prior to the acquisition date.

## DEFENDANTS FALSELY ACCUSE PLAINTIFFS OF FRAUD
## TO HIDE HEALTH NET'S LOSSES

39.     Beginning during the second half of 2015, Defendants conspired to create and implement a systematic campaign of targeting and refusing to pay or underpaying certain claims to stem the financial bleeding from Health Net's PPO policies. Rather than abide by the terms of Health Net's policies and its duty of good faith and fair dealing, and accept the losses which occurred as the result of Health Net's policy design, Defendants created a plan to resolve Health Net's financial issues by arbitrarily

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1    reducing or eliminating payments to out-of-network substance use disorder providers

2    in California.

3          40.     Defendants' plan involved various steps to achieve the financial savings

4    they hoped for and had conveyed to shareholders. For example, Health Net instituted a

5    blanket policy of denying and underpaying claims for certain types of behavioral

6    health services. To implement the policy and ensure it was followed by claims

7    personnel, Health Net revised its claims handling manual to instruct claims personnel

8    on how these claims should be handled, denied, and underpaid.

9          41.     Pursuant to Defendants' plan, by November 2015, Health Net's payments

10   to California substance use disorder treatment centers became sporadic. The reduction

11   or elimination of benefit payments was not limited to Plaintiffs but was a uniform

12   practice put in place by Defendants impacting claims submitted by in excess of 1,000

13   California substance treatment centers.

14         42.     Plaintiffs are informed and believe that, in January 2016, Health Net hired

15   Manatt to collaborate on a strategy regarding the outstanding claims by out-of-network

16   substance abuse providers.  In furtherance of the plan, Gohari, Julian, LeBlanc and

17   Hernandez devised a fraudulent scheme to advance a variety of false accusations

18   against Plaintiffs and other out-of-network substance abuse providers.

19         43.     As part of the scheme devised by Gohari, Julian, LeBlanc and Hernandez,

20   in January 2016, Health Net instituted a special investigation unit ("SIU") "audit" of

21   Plaintiffs and all or substantially all substance use disorder treatment centers in

22   California as a pretext for refusing to pay claims. Providers like Plaintiffs were placed

23   on an SIU "watchlist." Defendants instructed claims personnel to re-route all claims

24   from providers on the "watchlist" to the out-of-network behavioral health SIU audit

25   unit. This audit was directed by Gohari, Julian, Hernandez and LeBlanc and led to an

26   exponential increase in the number of claims that Health Net refused to pay. Before

27   and after the merger was concluded in March 2016, Centene joined the scheme and

28   participated in the audit.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

44.     In connection with the "audit," Gohari drafted a boiler plate form letter to more than 1,000 treatment centers designed to hide the blanket policy of refusing to pay certain claims and the policy of indiscriminately rerouting claims to SIU. Gohari caused the letter to bear the signature of Health Net's Director of SIU, Matthew Ciganek, without Mr. Ciganek's prior knowledge.  The Ciganek letter imposed unlawful and onerous burdens on providers regarding claim submission, requesting extensive and unusual amounts of documentation in a short time frame (15 days). The letter also stated that Health Net was suspending payment on claims previously submitted and that Health Net was investigating alleged fraudulent practices.

45.     In putting its fraudulent scheme into effect, Health Net, at the direction of Gohari, Julian, Hernandez and LeBlanc, falsely alleged in the Ciganek letter that the failure of out of network mental health and substance use disorder treatment providers to collect the patients' deductibles, copayments or co-insurance could raise questions regarding false or fraudulent claims. Health Net's 2015 and 2016 ACA policies, however, were *coinsurance only policies* with zero deductible and zero copayments for out-of-network services. Moreover, it is impossible for treatment providers to determine co-insurance *before* an insurer adjudicates the claim. As a pretext for refusing to pay claims and to hide the blanket policies described above, the Ciganek letter placed an impossible burden on providers by refusing to adjudicate claims unless and until providers submitted proof of something (coinsurance) that can only be determined *after* claim adjudication.  Neidorff has also publicly acknowledged that Health Net's ACA policies did not include the cost-sharing provisions (a co-payment or deductible for out-of-network services) of which Ciganek's letter demanded proof.

46.     The Ciganek letter also stated that eligibility under the Health Net policies was limited to individuals who "permanently reside" in a defined California area. There is no such requirement in the policies. Health Net had the authority to approve or deny enrollment applications, a process with which Plaintiffs had no involvement. Under California law, in the event Health Net believed it had issued coverage on the

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

basis of a material misrepresentation on the application, its sole remedy was to rescind coverage within two years. At no time during the relevant period has Health Net rescinded a single policy issued in California on the basis that the policyholder did not permanently reside in a defined California area. Defendants used these pretenses to effect a fraudulent scheme and avoid paying valid claims by punishing providers and insureds for acting within the terms of Health Net's policies.

47. The Ciganek letter also alleged that claim payment may not be appropriate if improper payments (such as payment of premiums) or other consideration has been made to patients "to induce procurement of services from your facility." Neither federal nor California law, however, prohibits third-party premium payment or cost sharing assistance to prospective patients. Additionally, Health Net's policies did not contain any provision prohibiting third party premium payments. In fact, Neidorff publicly acknowledged that the Health Net policies allowed third party premium payments and stated that one of the key changes Centene was making was placing "restrictions on third-party premium payments, which were not included in the original 2016 offering." In March 2017, LeBlanc authored an article entitled "*Third Party Payment of Premiums: Controversy and HHS Guidance*" in which he concluded that the payment of health insurance premiums by third parties did not violate the law. As such, Defendants' premising all or any part of a "special investigation" on conduct that Defendants acknowledged was permitted under the policy language was not just disingenuous, but fraudulent.

48. Defendants also developed a scheme to conceal Health Net's under-reserved substance use disorder treatment claims by introducing certain claims procedures that assured none of Plaintiffs' claims were paid.  In May and June 2016, Defendants revised the claims handling manual guideline to specifically provide that Plaintiffs' claims were not paid at a percentage of the billed amount but, instead, a Medicare percent conversion factor.  To conceal the new procedures, neither policyholders nor providers were given notice of these changes in claims processing.

Not paying the 75% or 100% reimbursement rate, and instead using the Medicare rate, was a component of Defendants' fraudulent scheme to retroactively resolve the financial problems caused by their own "plan design flaws."

49. Plaintiffs are informed and believe that, in early 2016, Centene and Health Net hired Optum to further Defendants' fraudulent scheme. Centene, Health Net and Optum, at the direction of Gohari, Julian, Hernandez and LeBlanc, attempted to manufacture evidence to support their false accusations. Specifically, Defendants interviewed Plaintiffs' former employees. During those interviews, Defendants falsely accused Plaintiffs of a variety of unlawful, unethical and immoral conduct for the purpose of inducing witnesses to, essentially, gossip, including (1) opening facilities just to make money; (2) billing insurance companies for services that were not provided; (3) double billing for services provided; (4) using employees in India to create charts and medical records for patients; (5) pressuring employees to treat patients at a higher level of care than was medically indicated; (6) pressuring employees to alter patient diagnoses; (7) allowing patients to get pregnant in treatment and then kicking them out; and (8) "human trafficking" by trading patients.

50. Defendants also exaggerated, mischaracterized, and falsely recorded the substance of interviews. For example, Defendants falsely recorded that at least one witness said Dr. Tonmoy Sharma, Plaintiffs' then-CEO, was a flight risk and that he had threatened a witness. In addition, Optum, on behalf of Defendants, offered to pay the claims of other out-of-network substance abuse providers if they provided "evidence" against Sovereign to support Defendants' false accusations.

51. Defendants also spoke to other health insurance companies to "collaborate" on the false accusations Defendants were making against Plaintiffs. Defendants shared this false information in an effort to convince other health insurance companies to stop paying claims submitted by Plaintiffs. Optum specifically participated in this "collaboration."

52. Optum hired unqualified medical providers to conduct "medical necessity" reviews of certain claims. These providers did not meet the written standards set by Health Net. The providers were given a list of language to insert in their reviews to deny the claims. They did not speak to the patients or to anyone at Sovereign. They accessed medical records electronically but did not confirm or inquire as to whether the records were complete. The providers applied outdated guidelines created by a third-party vendor and did not know or inquire as to whether these guidelines were consistent with the applicable plan or policy language.

53. After the providers finished their reviews, Dr. Matthew Wong of Health Net signed off on the reviews, without speaking with the providers or conducting any review of his own.  Health Net sent out denial letters based on these reviews and signed Dr. Wong's name on those letters, without his prior knowledge.

54. Defendants knew that they were obligated to pay the outstanding claims unless they were able to discredit Plaintiffs and/or force them out of business.  In late 2016, Defendants initiated multiple meetings with law enforcement and regulatory entities in an attempt to convince them to institute criminal proceedings against Plaintiffs.  Defendants repeated their blatantly false allegations, telling these entities:

    a. Plaintiffs were treating Health Net patients and "dumping" them on the street when insurance coverage was denied.

    b. Plaintiffs were about to close their facilities.

    c. Dr. Tonmoy Sharma was about to flee the country.

    d. Plaintiffs were using "cappers" and "runners" to solicit patients.

55. Defendants met with the District Attorney in Los Angeles and Orange County, as well as the California Department of Insurance, all of whom refused to act on Defendants' allegations.  Determined to have criminal proceedings initiated against Plaintiffs, Julian, on behalf of all Defendants, created a Power Point presentation in which Defendants: falsely accused Plaintiffs of the manufactured conduct described above; suggested "targets" for criminal investigation; misrepresented the contents of

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

interviews; and, suggested legal theories for criminal prosecution. This Power Point was presented to Julian's former colleagues at the FBI and the U.S. Attorney in Orange County. Defendants specifically omitted, however, that Plaintiffs had sued Defendants to recover the unpaid amounts.

56.     On the morning of June 13, 2017, based on the misrepresentations presented by Defendants, more than 100 armed guards from the FBI, U.S. Department of Health and Human Services, IRS, DHCS, and several other agencies, simultaneously executed search warrants at six Sovereign locations across southern California and the home of Dr. Tonmoy Sharma.  Mental health patients and others recovering from substance abuse addiction, as well as their counselors, medical care providers, and Sovereign employees, were physically escorted from their rehabilitative activities and ordered to line up while government agents seized business and personal documents. Agents, some with weapons drawn, immediately separated patients from employees, confining employees to conference rooms and lobbies and forcing patients, many suffering from PTSD and anxiety, to stand outside with armed agents. Patients and employees were searched and interrogated; cell phones were confiscated.

57.     Defendants ultimately achieved its desired result: Over one hundred patients left treatment on the day of the raid.  Immediately thereafter, Plaintiffs' bank forced them to close their accounts. In furtherance of their goal to put Plaintiffs out of business, Defendants arranged to have a reporter at the raid, who published articles in local newspapers, repeating Defendants' false allegations.  These false allegations were picked up by various other news outlets, landing additional blows against Plaintiffs' business. Patient admissions and revenue declined.  As a result of Defendants' conduct, Plaintiffs were forced to close all nine of its facilities and layoff nearly 1,200 employees.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

## CA DOI ORDERS HEALTH NET TO SHOW CAUSE

58.     On June 23, 2017, the DOI issued an Order to Show Cause ("OSC") to Health Net, stating that it had received hundreds of complaints from out-of-network substance use disorder providers about Health Net's handling of claims for treatment of Health Net policyholders. The OSC alleges that Health Net's refusal to honor the policy language, requiring reimbursement at 75% of billed charges, evidences unfair claims practices, violations of the Mental Health Parity Act, and unfair and/or deceptive act of practices in violation of California Insurance Code Section 790.03.

59.     Plaintiffs are informed and believe that Defendants misrepresented to the DOI that it was resolving the claims of the out-of-network substance use disorder treatment providers. In truth, Defendants have refused and failed to do so with respect to Plaintiffs and others who have rightfully exercised their rights, as assignees of Health Net policyholders, to pursue payment of the outstanding claims. In August 2017, the California DOI withdrew the OSC.

60.     On July 24, 2018, however, the DOI issued a new OSC alleging that Health Net's refusal to honor its policy language violates the law. The DOI stated that Health Net's referral of all claims to its SIU unit "directly upon receipt of the claims payment request, prior to performing a reasonable review of the claim" and placing providers "on an audit list and then require[ing them] to prove that they should be removed from the list before any payment was made" "resulted in illegitimate denials and delayed payment of claims" and "*is an unreasonable standard for the investigation and processing of claims*."

61.     On January 6, 2019, Health Net settled with the DOI for $1,025,000.

## FIRST CAUSE OF ACTION
## VIOLATION OF RICO, 18 U.S.C. § 1962(c)

62.     Plaintiffs incorporate by reference all paragraphs alleged above.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1   63.     Each of the Defendants is a "person" within the meaning of 18 U.S.C.

2   § 1961(3).

3   64.     Each of the Defendants together constitute an "enterprise" within the

4   meaning of 18 U.S.C. § 1961(4) and are referred to herein as "the enterprise."

5   65.     Each of the Defendants has repeatedly and systematically conducted and

6   participated, directly and indirectly, in the conduct of the affairs of the enterprise

7   through a pattern of "racketeering activity" consisting of two or more predicate acts in

8   furtherance of the above-described fraudulent scheme, in violation of 18 U.S.C. § 1341

9   (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

10   66.     Pursuant to and in furtherance of their fraudulent scheme, each of the

11   Defendants knowingly and willfully used and caused to be used the United States mail

12   and/or interstate wires to commit multiple acts, including:

13          a.     Conducting an unfounded and fraudulent audit of legitimate claims

14   for treatment of Health Net policyholders submitted by Plaintiffs and other out

15   of network mental health and substance use disorder providers;

16          b.     "Pending" indefinitely the review of legitimate claims for the

17   treatment of Health Net policyholders, without a good faith investigation into

18   whether the claims were covered by the applicable policy, and without

19   informing Plaintiffs or the policyholders of the status of those claims;

20          c.     Failing and refusing to pay legitimate claims for treatment of

21   Health Net policyholders submitted by Plaintiffs on the ground that a referral fee

22   was paid for the placement of the policyholder, without a legitimate basis for

23   using the payment of a referral fee as an excuse for failing to pay a claim,

24   without a good faith investigation into whether the claims were covered by the

25   applicable policy, and without informing Plaintiffs or the policyholders of the

26   status of those claims;

27          d.     Failing and refusing to pay Plaintiffs' legitimate claims for

28   treatment of Health Net policyholders absent proof that the patients first paid

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

17

COMPLAINT

amounts that they were not required to pre-pay and/or that could not be determined until Health Net paid the legitimate claims;

e.     Failing and refusing to pay Plaintiffs' legitimate claims for treatment of Health Net policyholders on the grounds that premiums were paid by Plaintiffs or third parties, despite no ban on third party payment of premiums in the applicable policies or under the law;

f.     Offering to pay the claims of other out-of-network substance abuse providers if they offered "evidence" against Plaintiffs;

g.     Contacting other insurance companies to share false accusations and encourage them to stop paying Plaintiffs' claims;

h.     Using an inappropriate and unlawful calculation for the amount owed on paid claims;

i.     Falsely reporting to law enforcement that Plaintiffs had engaged in unlawful conduct;

j.     Falsely reporting to law enforcement that Plaintiffs' principal was a flight risk;

k.     Interfering with the payment of Plaintiffs' legitimate claims for patients who did not have Health Net policies.

l.     Persisting in its refusal to pay thousands of valid and covered claims after and despite DOI's findings described above and Defendants' representations to DOI that it was resolving these claims.

67.     Defendants used or caused to be used the United States mail and/or interstate wires in creating, implementing, and concealing from Plaintiffs a blanket policy of denying, permanently "pending" and refusing to pay, and underpaying valid and covered claims of a certain type or from certain providers including Plaintiffs without any investigation into the merits of such claims by, for example:

a.     Mailing letters to Plaintiffs, patients, and other providers with boilerplate language misrepresenting Defendants' rationale for investigating

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

and/or refusing to pay claims, the purpose of which was to mislead and conceal Defendants' fraudulent scheme and the wrongful policies described above, and misrepresenting that the letters complied with applicable law and regulations;

b.      Distributing claims handling guidelines to claims personnel outlining the blanket policies of denying, underpaying, refusing to pay, and referring to SIU claims of a certain type or from certain providers, including Plaintiffs, without independently investigating the merits of such claims or the validity of any accusations against Plaintiffs;

c.      Sending claims and medical records to Optum to conducting inadequate and fraudulent medical reviews to manufacture support for the knowingly wrongful refusal to pay claims that were valid and covered; and

d.      Affixing Dr. Matthew Wong's signature to denial letters with his knowledge, and sending the letters through mail or electronic mail, to Plaintiffs and their Health Net patients.

68.    The enterprise's fraudulent scheme, as described above, has continued for a substantial period and is ongoing. It began in 2015 and continues today, five years later, thus amounting to continuing fraudulent activity and posing a threat of such fraudulent activity continuing into the future. Further, these acts demonstrate Defendants' ongoing and regular way of doing business.

69.    The enterprise is engaged in, and its activities affect, interstate commerce.

70.    As a direct and proximate result of the above-described pattern of racketeering activity, the enterprise damaged Plaintiffs in an amount to be proven at trial by causing Plaintiffs to close its operations.

71.    Plaintiffs are entitled to an injunction requiring each of the Defendants to cease the conduct alleged in this cause of action, treble damages, costs of litigation, and reasonable attorney fees pursuant to 18 U.S.C. § 1964 and applicable law.

## **SECOND CAUSE OF ACTION**

### **CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)**

72.     Plaintiffs incorporate by reference all paragraphs alleged above.

73.     Each of the Defendants is a "person" within the meaning of 18 U.S.C. § 1961(3).

74.     Each of the Defendants together constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and are referred to herein as "the enterprise."

75.     The enterprise engaged in a pattern of "racketeering activity" consisting of two or more predicate acts in furtherance of the above-described fraudulent scheme, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

76.     Each of the Defendants deliberately joined "the enterprise" with knowledge of its purpose.

77.     Pursuant to and in furtherance of their fraudulent scheme, each of the Defendants knowingly and willfully agreed that "the enterprise" would be used or cause to be used the United States mail and/or interstate wires to commit multiple acts, including

   a.     Conducting an unfounded and fraudulent audit of legitimate claims for treatment of Health Net policyholders submitted by Plaintiffs and other out of network mental health and substance use disorder providers;

   b.     "Pending" indefinitely the review of legitimate claims for the treatment of Health Net policyholders, without a good faith investigation into whether the claims were covered by the applicable policy, and without informing Plaintiffs or the policyholders of the status of those claims;

   c.     Failing and refusing to pay legitimate claims for treatment of Health Net policyholders submitted by Plaintiffs on the ground that a referral fee was paid for the placement of the policyholder, without a legitimate basis for using the payment of a referral fee as an excuse for failing to pay a claim, without a good faith investigation into whether the claims were covered by the

applicable policy, and without informing Plaintiffs or the policyholders of the status of those claims;

d.     Failing and refusing to pay Plaintiffs' legitimate claims for treatment of Health Net policyholders absent proof that the patients first paid amounts that they were not required to pre-pay and/or that could not be determined until Health Net paid the legitimate claims;

e.     Failing and refusing to pay Plaintiffs' legitimate claims for treatment of Health Net policyholders on the grounds that premiums were paid by Plaintiffs or third parties, despite no ban on third party payment of premiums in the applicable policies or under the law;

f.     Offering to pay the claims of other out-of-network substance abuse providers if they offered "evidence" against Plaintiffs;

g.     Contacting other insurance companies to share false accusations and encourage them to stop paying Plaintiffs' claims;

h.     Using an inappropriate and unlawful calculation for the amount owed on paid claims;

i.     Falsely reporting to law enforcement that Plaintiffs had engaged in unlawful conduct;

j.     Falsely reporting to law enforcement that Plaintiffs' principal was a flight risk;

k.     Interfering with the payment of Plaintiffs' legitimate claims for patients who did not have Health Net policies.

78.     The enterprise's fraudulent scheme, as described above, has continued for a substantial period and is ongoing.

79.     The enterprise is engaged in, and its activities affect, interstate commerce.

80.     As a direct and proximate result of the above-described pattern of racketeering activity, the enterprise damaged Plaintiffs in an amount to be proven at trial by causing Plaintiffs to close its operations.

81.     Plaintiffs are entitled to an injunction requiring each of the Defendants to cease the conduct alleged in this cause of action, treble damages, costs of litigation, and reasonable attorney fees pursuant to 18 U.S.C. § 1964 and applicable law.

## THIRD CAUSE OF ACTION
## INTENTIONAL INTERENCE WITH
## PROSPECTIVE ECONOMIC ADVANTAGE

82.     Plaintiffs incorporate by reference all paragraphs alleged above.

83.     Beginning in 2013, Plaintiffs had an economic relationship with Health Net policyholders who exercised their right to use their out-of-network benefit to obtain mental health and substance use disorder treatment. Pursuant to that relationship, Plaintiffs provided treatment to those patients and billed Health Net for that treatment. Defendants were aware of Plaintiffs' economic relationship with Health Net policyholders.

84.     In late 2015 or early 2016, Defendants decided that they wanted to discourage policyholders from exercising their rights to utilize their out-of-network benefits to obtain behavioral health treatment from Plaintiffs. In addition, Defendants wanted to avoid the requirements of Health Net's policy designs. To accomplish these goals, Defendants engaged in the following unlawful acts, among others, designed to disrupt the relationship between Plaintiffs and Health Net policyholders:

a.     Defendants "pended" and referred all claims submitted by Plaintiffs to Defendants' Special Investigations Unit, prior to performing a reasonable review of the claim. This conduct is an unreasonable standard for the investigation and processing of claims, in violation of California Ins. Code § 790.03(h)(3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

b.     Health Net sent Plaintiffs letters stating that payment of claims was contingent on submission of extensive documentation and attestation of

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

certain facts, many of which were irrelevant to the processing of the claims. This conduct constituted an unlawful failure to conduct and diligently pursue a thorough, fair and objective investigation of claims and resulted in unreasonable delays and denial of legitimate claims, in violation of California Ins. Code §790.03(h)(3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

c.   Defendants refused to pay claims based on the clear policy language, which required reimbursement at 75% or 100% of billed charges, but instead substituted a bundled per diem Medicare rate for an entirely different service furnished by an entirely different type of facility. This conduct was a misrepresentation of the applicable policy language and resulted in underpayment and unfair processing of claims, in violation of California Ins. Code § 790.03(h) (3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

d.   Defendants refused to pay any amount on the vast majority of claims submitted by Plaintiffs, despite the fact that the treatment had been authorized, was properly provided and was medically necessary, in violation of California Ins. Code § 796.04.

e.   Defendants falsely accused Plaintiffs of illegal conduct, damaging the good name and reputation of Plaintiffs, and causing Health Net policyholders and others to stop seeking treatment from Plaintiffs.

f.   Defendants reached out to other insurance companies, shared their false accusations, and encouraged them to stop paying claims submitted by Plaintiffs.

g.   Defendants' conduct was targeted at behavioral health providers, not providers of medical/surgical benefits, in violation of Federal Mental Health Parity and Addiction Equity Act of 2008, and the California Mental Health Parity Act, California Ins. Code §§ 10112.27(a)(2)(D) and 10144.4.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

23

85.     As a direct result of the conduct of Defendants, Plaintiffs were unable to continue treating Health Net policyholders.

86.     In 2018, as a further direct result of the conduct of Defendants, Plaintiffs were unable to sustain their operations, and were forced to close their treatment facilities.

87.     Plaintiffs have been damaged in an amount to be determined at trial, but which exceeds $625,000,000.00.

88.     Defendants' conduct, described herein, was intended to cause injury to Plaintiffs or was carried out with a willful and conscious disregard of the rights of Plaintiffs, subjected Plaintiffs to cruel and unjust hardship in conscious disregard to its rights, and was an intentional misrepresentation, deceit, or concealment of a material fact known to Defendants with the intention to deprive Plaintiffs of property, legal rights, or to otherwise cause injury, such as to constitute malice oppression or fraud under California Civil Code section 3294, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants.

## FOURTH CAUSE OF ACTION
## VIOLATION OF UNFAIR COMPETITION LAW,
## BUSINESS AND PROFESSIONS CODE §17200

89.     Plaintiffs incorporate by reference all paragraphs alleged above.

90.     Defendants' conduct, as set forth above, was unlawful, unfair and constitutes fraudulent business practices or acts.

91.     Defendants engaged in the following unlawful conduct, among others:

a.     Defendants "pended" and referred all claims submitted by Plaintiffs to Defendants' Special Investigations Unit, prior to performing a reasonable review of the claim. This conduct is an unreasonable standard for the investigation and processing of claims, in violation of California Ins. Code

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

§ 790.03(h)(3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

b.      Defendants sent Plaintiffs letters stating that payment of claims was contingent on submission of extensive documentation and attestation of certain facts, many of which were irrelevant to the processing of the claims. This conduct constituted an unlawful failure to conduct and diligently pursue a thorough, fair and objective investigation of claims and resulted in unreasonable delays and denial of legitimate claims, in violation of California Ins. Code §790.03(h)(3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

c.      Defendants refused to pay claims based on the clear policy language, which required reimbursement at 75% or 100% of billed charges, but instead substituted a bundled per diem Medicare rate for an entirely different service furnished by an entirely different type of facility. This conduct was a misrepresentation of the applicable policy language and resulted in underpayment and unfair processing of claims, in violation of California Ins. Code § 790.03(h) (3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

d.      Defendants refused to pay any amount on the vast majority of claims submitted by Plaintiffs, despite the fact that the treatment had been authorized, was properly provided and was medically necessary, in violation of California Ins. Code § 796.04.

e.      Defendants' conduct was targeted at behavioral health providers, not providers of medical/surgical benefits, in violation of Federal Mental Health Parity and Addiction Equity Act of 2008, and the California Mental Health Parity Act, California Ins. Code §§ 10112.27(a)(2)(D) and 10144.4.

92.     Defendants engaged in the following fraudulent and unfair business practices, among others:

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

25
COMPLAINT

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

a.     Defendants "pended" and referred all claims submitted by Plaintiffs to Defendants' Special Investigations Unit, prior to performing a reasonable review of the claim. This conduct is an unreasonable standard for the investigation and processing of claims, in violation of California Ins. Code § 790.03(h)(3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

b.     Defendants sent Plaintiffs letters stating that payment of claims was contingent on submission of extensive documentation and attestation of certain facts, many of which were irrelevant to the processing of the claims. This conduct constituted an unlawful failure to conduct and diligently pursue a thorough, fair and objective investigation of claims and resulted in unreasonable delays and denial of legitimate claims, in violation of California Ins. Code § 790.03(h)(3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

c.     Defendants refused to pay claims based on the clear policy language, which required reimbursement at 75% or 100% of billed charges, but instead substituted a bundled per diem Medicare rate for an entirely different service furnished by an entirely different type of facility. This conduct was a misrepresentation of the applicable policy language and resulted in underpayment and unfair processing of claims, in violation of California Ins. Code § 790.03(h) (3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

d.     Defendants refused to pay any amount on the vast majority of claims submitted by Plaintiffs, despite the fact that the treatment had been authorized, was properly provided and was medically necessary, in violation of California Ins. Code § 796.04.

COMPLAINT

e.     Defendants falsely accused Plaintiffs of illegal conduct, damaging the good name and reputation of Plaintiffs, and causing Health Net policyholders and others to stop seeking treatment from Plaintiffs.

f.     Defendants reached out to other insurance companies, shared their false accusations, and encouraged them to stop paying claims submitted by Plaintiffs.

g.     Defendants' conduct was targeted at behavioral health providers, not providers of medical/surgical benefits, in violation of Federal Mental Health Parity and Addiction Equity Act of 2008, and the California Mental Health Parity Act, California Ins. Code §§ 10112.27(a)(2)(D) and 10144.4.

93.     As a direct and proximate results of Defendants' unlawful, fraudulent and unfair business practices, Plaintiffs have suffered and will continue to suffer substantial monetary losses and irreparable injury.  Plaintiffs do not have an adequate remedy at law and will continue to suffer irreparable harm if an injunction does not issue ordering Defendants to stop their unlawful, fraudulent and unfair business practices.  Plaintiffs are entitled to an injunction under California Business and Professions Code § 17203.

94.     Defendants have been unjustly enriched by their unlawful, fraudulent and unfair business practices.  Plaintiffs seek restitution in an amount to be proved at trial.

## FIFTH CAUSE OF ACTION
### SLANDER PER SE

95.     Plaintiffs incorporate by reference all paragraphs alleged above.

96.     In or about December 2016, Defendants communicated and/or met with representatives from other health insurance carriers, including Anthem and Cigna.  In those communications and/or meetings, Defendants made statements that falsely accused Plaintiffs of illegal and unethical business conduct. These statements constitute slander *per se* under California Civil Code § 46 (1) and (3).

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

97.     Defendants did not fully reveal these private communications until October 2019.

98.     As a direct result of the conduct of Defendants, Plaintiffs were unable to sustain their operations, and were forced to close their treatment facilities.  As a result, Plaintiffs have been damaged in an amount to be determined at trial, but which exceeds $625,000,000.00.

99.     Defendants' conduct, described herein, was intended to cause injury to Plaintiffs or was carried out with a willful and conscious disregard of the rights of Plaintiffs, subjected Plaintiffs to cruel and unjust hardship in conscious disregard to its rights, and was an intentional misrepresentation, deceit, or concealment of a material fact known to Defendants with the intention to deprive Plaintiffs of property, legal rights, or to otherwise cause injury, such as to constitute malice oppression or fraud under California Civil Code section 3294, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.     Damages in an amount to be determined at the time of trial but in excess of $625,000,000, plus interest, including prejudgment interest;

2.     General damages and other incidental damages;

3.     Treble damages under RICO;

4.     Punitive and exemplary damages in an amount in excess of $500,000,000;

5.     Injunctive relief requiring Defendants to ease engaging in unlawful, unfair and fraudulent business acts and practices;

6.     Reasonable attorney fees as allowed by law;

7.     Costs of suit incurred herein; and

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1          8.      Such other and further relief as the Court deems just and proper.

2

3    Dated:  May 5, 2020              **KANTOR & KANTOR, LLP**
                                      LISA S. KANTOR
4                                     TIMOTHY J. ROZELLE

5                                     **DAWSON & ROSENTHAL, P.C.**
                                      STEVEN C. DAWSON
6                                     ANITA ROSENTHAL
                                      SANDER DAWSON
7
                                      By:___ */s/ Lisa S. Kantor*_____
8                                            Lisa S. Kantor,
                                             Attorneys for Plaintiffs, Dual Diagnosis
9                                            Treatment Center, Inc., Satya Health of
                                             California, Inc., Adeona Healthcare, Inc.,
10                                           Sovereign Health of Florida, Inc., Sovereign
                                             Health of Phoenix, Inc., Sovereign Health of
11                                           Texas, Inc, Shreya Health of Florida, Inc.,
                                             Shreya Health of Arizona, Inc., Vedanta
12                                           Laboratories, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2        Plaintiffs hereby demand a trial by jury.

3

4   Dated:  May 5, 2020           **KANTOR & KANTOR, LLP**

5                                 LISA S. KANTOR
                                  TIMOTHY J. ROZELLE
6
                                  **DAWSON & ROSENTHAL, P.C.**
7                                 STEVEN C. DAWSON
                                  ANITA ROSENTHAL
8                                 SANDER DAWSON

9                                 By:___/s/ Lisa S. Kantor_____
                                     Lisa S. Kantor,
10                                   Attorneys for Plaintiffs, Dual Diagnosis
                                     Treatment Center, Inc., Satya Health of
11                                   California, Inc., Adeona Healthcare, Inc.,
                                     Sovereign Health of Florida, Inc., Sovereign
12                                   Health of Phoenix, Inc., Sovereign Health of
                                     Texas, Inc, Shreya Health of Florida, Inc.,
13                                   Shreya Health of Arizona, Inc., Vedanta
                                     Laboratories, Inc.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525