1   Lisa S. Kantor (SBN 110678)
     *lkantor@kantorlaw.net*
2   Timothy J. Rozelle (SBN 298332)
     *trozelle@kantorlaw.net*
3   KANTOR & KANTOR, LLP
    19839 Nordhoff Street
4   Northridge, CA 91324
    Tel: (818) 886-2525; Fax: (818) 350-6272
5
    Steven C. Dawson, (*admitted pro hac vice*)
6   Arizona State Bar No. 006674
     *sdawson@dawsonandrosenthal.com*
7   Anita Rosenthal(*admitted pro hac vice*)
    Arizona State Bar No. 006199
8    *arosenthal@dawsonandrosenthal.com*
    Sander R. Dawson (SBN 302431)
9    *sander@dawsonandrosenthal.com*
    Dawson & Rosenthal, P.C.
10   25 Schnebly Hill Road
    Sedona, AZ 86336
11   Tel: (928) 282-3111; Fax: (928) 282-3126

12   Attorneys for Plaintiffs, Dual Diagnosis Treatment Center, Inc.,
    Satya Health of California, Inc., Adeona Healthcare, Inc.,
13   Sovereign Health of Florida, Inc., Sovereign Health of Phoenix,
    Inc., Sovereign Health of Texas, Inc, Shreya Health of Florida,
14   Inc., Shreya Health of Arizona, Inc., Vedanta Laboratories, Inc.

15            **UNITED STATES DISTRICT COURT**

16            **CENTRAL DISTRICT OF CALIFORNIA**

17   DUAL DIAGNOSIS TREATMENT          )   Case No.:  2:20-cv-04112-DSF-PVC
    CENTER, INC., a California corporation;  )
18   SATYA HEALTH OF CALIFORNIA,       )   **THIRD AMENDED**
    INC., a California corporation; ADEONA  )   **COMPLAINT FOR**
19   HEALTHCARE, INC., a California        )
    corporation; SOVEREIGN HEALTH OF  )   **1. VIOLATION OF RICO, 18**
20   FLORIDA, INC., a Delaware corporation;  )      **U.S.C. § 1962(c)**
    SOVEREIGN HEALTH OF PHOENIX,      )
21   INC., a Delaware corporation;          )   **2. CONSPIRACY TO VIOLATE**
    SOVEREIGN HEALTH OF TEXAS, INC.,  )      **RICE, 18 U.S.C. §1962 (d)**
22   a Delaware corporation; SHREYA        )
    HEALTH OF FLORIDA, INC., a Florida  )
23   corporation; SHREYA HEALTH OF     )   **3. INTENTIONAL**
    ARIZONA, INC. an Arizona corporation,  )      **INTERFERENCE WITH**
24   and VEDANTA LABORATORIES, INC., a  )      **PROSPECTIVE ECONOMIC**
    Delaware corporation,                 )      **ADVANTAGE**
25                                        )
              Plaintiffs,                )   **4. VIOLATION OF UNFAIR**
26                                        )      **COMPETITION LAW**
         vs.                             )
27                                        )   **5. SLANDER**
    CENTENE CORPORATION, a Delaware  )
28   corporation; MICHAEL NEIDORFF, an  )   **DEMAND FOR JURY TRIAL**

—————————————————————————————————————
              THIRD AMENDED COMPLAINT

1
2
3
4

individual; HEALTH NET LIFE )
INSURANCE COMPANY, a California )
corporation; MANAGED HEALTH )
NETWORK, INC., a Delaware corporation; )
OPTUM SERVICES, INC., a Delaware )
corporation, )
)
)
            Defendants. )
_____ )

5
6

## PLAINTIFFS

7
8
9
10

1.     Plaintiff Dual Diagnosis Treatment Center, Inc. ("Dual Diagnosis") is a corporation organized and existing under the laws of California. Dual Diagnosis does business as "Sovereign Health of California" and on occasion under other names as permitted by law. Until July 2018, Dual Diagnosis operated and maintained mental health and substance treatment facilities in California.

11
12
13
14
15
16
17

2.     Plaintiff Satya Health of California, Inc. ("Satya") is a corporation duly organized and existing under the laws of California. Satya does business as "Sovereign by the Sea II," and on occasion under other names as permitted by law. Until July 2018, Satya operated and maintained mental health treatment facilities in California, providing detoxification treatment, residential treatment (RTC), partial hospitalization program (PHP), intensive outpatient treatment (IOP), and outpatient treatment (OP). Satya was licensed to treat patients with mental health and/or substance use disorders.

18
19
20
21
22
23

3.     Plaintiff Adeona Healthcare, Inc. ("Adeona") is a corporation duly organized and existing under the laws of California. Adeona does business as "Sovereign Health Rancho/San Diego." Until July 2018, Adeona operated and maintained mental health treatment facilities in El Cajon California, providing RTC, PHP and IOP treatment for children ages 12 through 17. Adeona was licensed to treat patients with mental health and/or substance use disorders.

24
25
26
27

4.     Plaintiff Sovereign Health of Florida, Inc. ("Sovereign Florida") is a corporation duly organized and existing under the laws of Delaware. Until July 2018, Sovereign Florida operated and maintained a mental health treatment facility in Fort

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

THIRD AMENDED COMPLAINT

Myers, Florida, providing detox, RTC, PHP, IOP and OP treatment. Sovereign Florida was licensed to treat patients with mental health and substance use disorders.

5.    Plaintiff Sovereign Health of Phoenix, Inc. ("Sovereign Phoenix") is a corporation duly organized and existing under the laws of Delaware. Until July 2018, Sovereign Phoenix operated and maintained a mental health facility in Chandler, Arizona providing RTC, PHP, IOP and OP treatment. Sovereign Phoenix was licensed to treat patients with mental health and/or substance use disorders.

6.    Plaintiff Sovereign Health of Texas, Inc. ("Sovereign Texas") is a corporation duly organized and existing under the laws of Delaware. Until July 2018, Sovereign Texas operated and maintained a mental health facility in El Paso, Texas providing detoxification treatment, RTC, PHP and IOP. Sovereign Texas was licensed to treat patients with mental health and/or substance use disorders.

7.    Dual Diagnosis, Satya, Adeona, Sovereign Florida, Sovereign Phoenix and Sovereign Texas are sometimes referred to herein as "Sovereign facilities".

8.    Plaintiff Shreya Health of Florida, Inc. ("Shreya Florida") is a corporation duly organized and existing under the laws of Florida. Until July 2018, Shreya Florida was a billing entity for ancillary services rendered to patients treating at Sovereign Florida.

9.    Plaintiff Shreya Health of Arizona, Inc. ("Shreya Arizona") is a corporation duly organized and existing under the laws of Arizona. Until July 2018, Shreya Arizona was a billing entity for ancillary services provided to patients treating at Sovereign Phoenix.

10.    Vedanta Laboratories, Inc. ("Vedanta") is a corporation duly organized and existing under the laws of Delaware. Vedanta was authorized to provide laboratory services by COLA (formerly the Commission on Office Laboratory Accreditation), an accreditation organization for clinical laboratories under the Clinical Laboratory Improvement Amendments (CLIA) program. Until July 2018, Vedanta conducted laboratory testing services for the Sovereign facilities.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

THIRD AMENDED COMPLAINT

11.     Collectively plaintiffs are referred to as "Sovereign" or "Plaintiffs."

**DEFENDANTS**

12.     Defendant Centene Corporation ("Centene") is a corporation duly organized and existing under the laws of Delaware, and a Fortune 500 company, with its headquarters in St. Louis, Missouri. Centene is the parent company of Health Net. Centene also has an office in Woodland Hills, California.

13.     Defendant Michael Neidorff ("Neidorff") is, and at all relevant times was, the CEO of Centene.

14.     Defendant Health Net Life Insurance Company ("Health Net") is a California corporation with its principal place of business at 21281 Burbank Boulevard, Building B3, Woodland Hills, California. Health Net sells individual health insurance policies in California.

15.     Defendant Managed Health Network, Inc. ("MHN") is a Delaware corporation with a principal place of business at 11931 Foundation Place, Building D, Rancho Cordova, California 95670. MHN is the behavioral health subsidiary of Health Net.

16.     Defendant Optum Services, Inc. ("Optum") is a Delaware corporation with its principal place of business at 11000 Optum Circle, Eden Prairie, Minnesota. Optum is a health services business serving the health care marketplace, including payers and health care providers, and provides shared claim handling and processing services. Optum sometimes operates as Optum and Optum Shared Solutions.

17.     Collectively Centene, Neidorff, Health Net, MHN, and Optum are referred to as "Defendants."

**JURISDICTION AND VENUE**

18.     Jurisdiction is based on 18 U.S.C. §§1962, 1965 (Racketeer Influenced and Corrupt Organizations) and 28 U.S.C. § 1367 (Supplemental Jurisdiction).

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) and (c)(2). Health Net and MHN reside in this judicial district, all of the Defendants do

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

THIRD AMENDED COMPLAINT

business in this judicial district, and much of the conduct that is the subject of this lawsuit occurred within this judicial district.

## PLAINTIFFS WERE AWARD-WINNING
## MENTAL HEALTH PROVIDERS

20.     Plaintiffs offered specialized treatment for mental health, substance abuse and dual diagnosis disorders for adults and adolescents. In operation from 2009 through 2018, Plaintiffs had nine licensed treatment facilities in five states and employed approximately twelve hundred (1,200) people in the United States, including approximately sixty professionals with M.D. or PhD degrees.  Plaintiffs have treated thousands of patients across the country, with an independently verified track record of success which far exceeds the industry average.

21.     Plaintiffs' California facilities were licensed by the California Department of Healthcare Services (DHCS) since 2009 for detoxification and residential treatment and by the California Department of Social Services (DSS), since 2012, for Mental Health Treatment. Similarly, Plaintiffs' facilities in Arizona, Florida, and Texas were licensed by the appropriate agencies for treatment of mental health and substance abuse disorders.

22.     Plaintiffs' approach to addiction and mental health treatment was consistent with best practices in the industry. Its facilities earned The Gold Seal of Approval from The Joint Commission, an independent not-for-profit organization that is the nation's oldest and largest standard setting and accrediting body in health care. The National Alliance of Mental Illness recognized Sovereign for providing "The Gold Standard for Mental Health Treatment for patients in Orange County and throughout the country." Studies conducted in 2016 and 2017 by Harvard Medical School Affiliate, McLean Hospital, consistently found that Plaintiffs' residential patients were up to two times sicker than those typically admitted to other accredited behavioral healthcare providers and that Plaintiffs' programs produced clinical outcomes up to three times better than these comparable institutions.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

THIRD AMENDED COMPLAINT

23.     Plaintiffs were widely recognized behavioral health educators. Since 2015, the American Psychological Association authorized Plaintiffs and their staff to train licensed doctoral psychologists. The California Board of Behavioral Health Sciences, the California Association of Alcohol/Drug Educators, the National Association of Alcoholism and Drug Abuse Counsel and the Association for Psychology, Post-Doctoral and Internship Centers approved Plaintiffs to provide continued education to licensed professionals in the substance abuse field. The University of Southern California sent its Master of Social Work students to receive training at Sovereign facilities. Plaintiffs also provided continued education to lawyers for the substance abuse requirement of MCLE.

24.     In 2015, Plaintiffs received an offer from a venture capital firm to purchase their businesses for $625 million.

25.     At all relevant times, the Sovereign facilities and Vedanta were "out-of-network" health care providers with respect to Health Net. In other words, these entities did not contracted with Health Net to provide mental health or substance use disorder treatment to patients with Health Net health insurance at a discounted rate pursuant to what is commonly referred to as an "in-network" contract.

## HEALTH NET ENTERS THE ACA EXCHANGE WITH A DEFECTIVE PRODUCT AND INADEQUATE NETWORK

26.     Effective 2014, the Affordable Care Act ("ACA") required health insurance policies to provide ten categories of "essential health benefits," including mental health and substance abuse treatment. 42 U.S.C. § 18022. In addition, under the ACA, states established on-line "exchanges," where the new ACA-compliant policies were marketed.

27.     In 2014, Health Net began marketing health insurance policies through the exchanges. At the time, the terms of Health Net's policies—designed to increase Health Net's market share—required payment to out-of-network mental health facility claims for inpatient, residential or outpatient treatment based on 75% or 100% of the billed amount. In contrast, most health insurance policies offered through the exchanges

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1   required payment to out-of-network mental health facility claims for inpatient,

2   residential or outpatient treatment at a significantly lower rate.

3       28.   Health Net had great success in the exchange market. In 2014 and 2015,

4   Health Net saw dramatic increases in the number of policyholders. As disclosed in

5   Health Net's SEC filings, enrollment in individual policies in Health Net's Western

6   Region increased 188.7 percent from year-end 2013 to year-end 2014, from

7   approximately 115,000 policyholders to 332,000 policyholders. In California alone,

8   enrollment increased 137.0 percent, from approximately 100,000 policyholders to

9   237,000 policyholders. According to Health Net, this significant increase was primarily

10  due to an increase in new individual policyholders from the ACA exchanges in

11  California and Arizona.

12      29.   Although Health Net was required by federal and California law to

13  maintain an adequate network of contracted behavioral health (BH) and substance use

14  disorder (SUD) treatment providers, Health Net's network of contracted, in-network

15  providers for BH and SUD services was grossly inadequate, leaving many if not most

16  of its insureds with no option but to go to out-of-network (OON) providers for such care.

17      30.   In Health Net's advertisements, marketing materials, and in its directory

18  available through the Health Net website portal, Health Net represented and marketed

19  to consumers that its health plans have specific BH/SUD providers under contract and

20  within its network of providers available to those consumers enrolled in the Health Net

21  PPO Policies.

22      31.   After insureds enrolled in the new Health Net PPO Policies, many

23  discovered that their provider networks did not include the BH/SUD providers Health

24  Net had represented to be in-network providers, and that those provider networks were

25  much more limited than previously represented by Health Net.

26      32.   Health Net had a clear incentive to conceal its networks: As a result of these

27  practices, Health Net significantly increased its share of the California health plan

28  market, while offering inferior products and not paying the contractually and statutorily

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

mandated benefits. Although the plan was successful in dramatically increasing Health Net's market share, it ultimately backfired.

## THE OPIOID CRISIS AND THE ACA LEAD TO AN INCREASE IN MENTAL HEALTH CLAIMS

33.     The ACA requirement that mental health be covered as an essential benefit and Health Net's huge increase in the number of policyholders led to an even more dramatic increase in the number and dollar amount of claims received by Health Net. In its filings with the California Department of Insurance ("DOI"), Health Net disclosed that in 2014 it earned $233.5 million in premiums for California policies but incurred $345.5 million in claims, resulting in a loss of $112 million. In the following year, 2015, Health Net earned $189 million in premiums, but incurred $473 million in claims, resulting in a loss of $284 million.

34.     The increase in the dollar amount of claims related to the treatment of substance abuse was particularly dramatic. According to Health Net's DOI filings, from 2014 to 2015 its *paid* substance abuse claims in California increased 1,577 percent. Out-of-network substance abuse claims alone accounted for 42.7 percent of all of Health Net's claims in California in 2015 (*i.e.,* $202,385,210 out of a total of $473,970,047). The number of out-of-network behavioral health claims, which include substance use disorder claims, were over 9,000 percent greater in 2015 than in-network behavioral health claims. Health Net attributed this difference solely to the fact that out-of-network claims were required to be paid at a percentage of billed charges rather than at the much lower negotiated rate it paid to in-network providers.

35.     In actuality, as Defendant Neidorff (Centene CEO) acknowledged in public comments during a Centene quarterly earnings call, the Health Net PPO policies were poorly designed and underpriced: "There were some design flaws that were just so obvious to those of us who have been doing it for a long time." ""It was a bad design before. The state, everybody recognized it." The design flaws Neidorff and other Centene executives acknowledged included that the policies were underpriced and

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

THIRD AMENDED COMPLAINT

lacked: "restrictions on third-party premium payments, which were not included in the original 2016 offering"; requirements for co-payments and deductibles for out-of-network services; caps on maximum allowances; and incentives for members to use in-network providers instead of going OON – "Health Net had the most liberal PPO out there, which encouraged adverse selection." Neidorff explained that "basically out-of-network providers could do what they wanted and we are liable at a time for 75% of billed charges till they change their certificate of coverage."

36.     In an October 2016 quarterly earnings call, Centene CEO Michael Neidorff explained that during the previous quarter, the company "recorded a premium deficiency reserve of approximately $300 million, due to unfavorable performance in some of Health Net's business operations." Neidorff assured the investment community that the unfavorable results had been dealt with through "benefit changes [that] included the first time inclusion of an out-of-network deductible for platinum and gold plans . . .; a significant increase in the out-of-network maximum out-of-pocket level . . .; the elimination of non-emerging out-of-state coverage and travel network access; the elimination of the default rate of 75% of billed charges to out-of-network services that do not have a Medicare rate; the reduction of reimbursement for out-of-network physicians and other services . . .; and restrictions on third-party premium payments, which were not included in the original 2016 offering."

37.     During the same period of time, this country was experiencing an opioid crisis. Opioid overdoses accounted for more than 42,000 deaths in 2016, more than any previous year on record. An estimated 40% of opioid overdose deaths involved a prescription opioid. https://www.hhs.gov/opioids/about-the-epidemic/index.html

## HEALTH NET MERGES WITH CENTENE

38.     On July 2, 2015, Health Net announced that it had entered into a merger agreement with Centene under which Centene would acquire 100% of Health Net. In October 2015, Health Net's stockholders voted to approve the adoption of the merger agreement with Centene. When the deal was finalized, it was valued at $6.8 billion.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

THIRD AMENDED COMPLAINT

1    39.    In March 2016, the California DOI concluded its review of the merger and

2    granted conditional approval, mandating that Centene keep Health Net's individual

3    policies on Covered California (the exchange marketplace in California under the ACA),

4    that Health Net ensure its networks of providers was adequate to meet the needs of its

5    insureds, and that Health Net make efforts to improve its ratings on the "report card"

6    issued to it by California Office of Patient Advocacy.

7    40.    Subsequent to the merger, Health Net's CEO received a golden parachute

8    worth $54,000,000 and its CFO received a golden parachute worth $23,400,000.

9    Neidorff received total compensation of approximately $20.75 million in 2015 and

10   $21.97 million in 2016.

11   41.    In July 2016, after the effective date of its merger with Health Net, Centene

12   could not long avoid disclosing to its shareholders that Health Net had incurred $390

13   million in liabilities, which existed as of the March 24, 2016 merger date, but had not

14   been properly accounted for and disclosed. At least $140 million of the undisclosed

15   liabilities related to substance use disorder claims in California. The increased liabilities

16   were greater than Health Net's entire pre-tax annual earnings for any of the prior five

17   years.

18   42.    In numerous public statements, Neidorff admitted that Centene knew about

19   Health Net's liability prior to March 2016. Centene admitted in public filings that Health

20   Net's liability existed prior to the acquisition date.

21   **DEFENDANTS FALSELY ACCUSE PLAINTIFFS OF FRAUD**

22   **TO HIDE HEALTH NET'S LOSSES**

23   43.    Beginning during the second half of 2015, Defendants conspired to create

24   and implement a systematic campaign of targeting and refusing to pay or underpaying

25   certain claims to stem the financial bleeding from Health Net's PPO policies. Rather

26   than abide by the terms of Health Net's policies and its duty of good faith and fair

27   dealing, and accept the losses which occurred as the result of Health Net's policy design,

28   Defendants created a plan to resolve Health Net's financial issues by arbitrarily reducing

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

10

or eliminating payments to out-of-network substance use disorder providers, with emphasis on California providers..

44.     Defendants' plan involved various steps to achieve the financial savings they hoped for and had conveyed to shareholders. For example, Health Net instituted a blanket policy of denying and underpaying claims for certain types of behavioral health services. To implement the policy and ensure it was followed by claims personnel, Health Net revised its claims handling manual to instruct claims personnel on how these claims should be handled, denied, and underpaid.

45.     Pursuant to Defendants' plan, by November 2015, Health Net's payments to California substance use disorder treatment centers became sporadic. The reduction or elimination of benefit payments was not limited to Plaintiffs but was a uniform practice put in place by Defendants impacting claims submitted by in excess of 1,000 California substance treatment centers.

46.     Internal company emails reveal that at the beginning of January 2016, Health Net was looking for a way to quickly eliminate benefits being paid to OON BH providers.

47.     Plaintiffs are informed and believe that, in January 2016, Defendants collaborated on a strategy regarding the outstanding claims by out-of-network substance abuse providers. In furtherance of the plan, Defendants devised a fraudulent scheme to advance a variety of false accusations against Plaintiffs and other out-of-network substance abuse providers.

48.     As part of the scheme devised by Defendants, in January 2016, Health Net instituted a special investigation unit ("SIU") "audit" of Plaintiffs and all or substantially all substance use disorder treatment centers in California as a pretext for refusing to pay claims. Providers like Plaintiffs were placed on a SIU "watchlist." Defendants instructed claims personnel to re-route all claims from providers on the "watchlist" to the out-of-network behavioral health SIU audit unit. This audit led to an exponential increase in

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

THIRD AMENDED COMPLAINT

the number of claims that Health Net refused to pay. Before and after the merger was concluded in March 2016, Centene joined the scheme and participated in the audit.

49.     In a September 2016 quarterly earnings call, Neidorff acknowledged that Centene knew about the various issues that led to the massive reserve deficiency when it bought Health Net – "[w]e had done our homework" – but decided to purchase Health Net despite this because "we knew what it would take to fix it. And that's just what we have been doing, very methodically." Centene worked "very aggressive[ly] in fixing it," and Neidorff was "personally [] involved in" those efforts, as he explained during quarterly earnings calls with the investment community. The efforts to "fix it" included, among other things, implementing various "changes that we want" with respect to the "plan design" and specifically "on the behavioral health" side, including, "[f]or example, we can now charge 100% of Medicare for out-of-network versus 75% of billed charges."

50.     In connection with the "audit" Defendants drafted and, on January 8, 2016, sent a boiler plate form letter to more than 1,000 treatment centers designed to delay the processing of claims as well as to delay the disclosure to shareholders of Health Net's financial losses, and to hide the blanket policy of refusing to pay certain claims and the policy of indiscriminately rerouting claims to SIU. The letter bore the signature of Health Net's Director of SIU, Matthew Ciganek. The Ciganek letter imposed unlawful and onerous burdens on providers regarding claim submission, requesting extensive and unusual amounts of documentation in a short time frame (15 days). The letter also stated that Health Net was suspending payment on claims previously submitted and that Health Net was investigating alleged fraudulent practices.

51.     In putting its fraudulent scheme into effect, Health Net falsely alleged in the Ciganek letter that the failure of out of network mental health and substance use disorder treatment providers to collect the patients' deductibles, copayments or co-insurance could raise questions regarding false or fraudulent claims. Health Net's 2015 and 2016 ACA policies, however, were *coinsurance only policies* with zero deductible and zero copayments for out-of-network services. Moreover, it is impossible for

THIRD AMENDED COMPLAINT

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

treatment providers to determine co-insurance *before* an insurer adjudicates the claim. As a pretext for refusing to pay claims and to hide the blanket policies described above, the Ciganek letter placed an impossible burden on providers by refusing to adjudicate claims unless and until providers submitted proof of something (coinsurance) that can only be determined *after* claim adjudication. Neidorff has also publicly acknowledged that Health Net's ACA policies did not include the cost-sharing provisions (a co-payment or deductible for out-of-network services) of which Ciganek's letter demanded proof.

52.     The Ciganek letter also stated that eligibility under the Health Net policies was limited to individuals who "permanently reside" in a defined California area. There is no such requirement in the policies. Health Net had the authority to approve or deny enrollment applications, a process with which Plaintiffs had no involvement. Under California law, in the event Health Net believed it had issued coverage on the basis of a material misrepresentation on the application, its sole remedy was to rescind coverage within two years. At no time during the relevant period has Health Net rescinded a single policy issued in California on the basis that the policyholder did not permanently reside in a defined California area. Defendants used these pretenses to effect a fraudulent scheme and avoid paying valid claims by punishing providers and insureds for acting within the terms of Health Net's policies.

53.     The Ciganek letter also alleged that claim payment may not be appropriate if improper payments (such as payment of premiums) or other consideration has been made to patients "to induce procurement of services from your facility." Neither federal nor California law, however, prohibits third-party premium payment or cost sharing assistance to prospective patients. Additionally, Health Net's policies did not contain any provision prohibiting third party premium payments. In fact, Neidorff publicly acknowledged that the Health Net policies allowed third party premium payments and stated that one of the key changes Centene was making was placing "restrictions on third-party premium payments, which were not included in the original 2016 offering."

THIRD AMENDED COMPLAINT

1  Defendants' premising all or any part of a "special investigation" on conduct that
2  Defendants acknowledged was permitted under the policy language was not just
3  disingenuous, but fraudulent.

4  54.    Defendants endeavored to conceal the improper claims handling policies
5  and reasons for non-payment of claims from members and providers for all OON
6  BH/SUD claims under HN's California PPO IFP products. Defendants' claims handling
7  guidelines instructed claims personnel to use specific denial or "disallow" codes for
8  contesting claims of a certain type – ones being targeted by the SIU audit – rather than
9  based on merit. For each denial/disallow code, the claims handling guidelines instructed
10  personnel to use a specific boilerplate explanation to give the member or provider in
11  letters explaining Health Net's basis for contesting the claim. The reasons given – both
12  in the guidelines and in many of the letters sent to Plaintiffs explaining the basis for non-
13  payment – did not reflect the actual basis for non-payment (the industry-wide dragnet
14  on OON BH/SUD claims). Instead, members and providers (including Plaintiffs) were
15  told that claims, which were in fact being contested based on type, such as toxicology
16  services for PPO products and all facility BH claims for PPO products, had not yet been
17  processed because evidence of payment for member deductibles, co-insurance, and co-
18  pays was needed. Neither evidence of such payments nor the payments themselves were
19  required by the relevant policies.

20  55.    In addition to the vague and dishonest bases for non-payment used in letters
21  to members and providers like Plaintiffs, Health Net gave its claims personnel "talking
22  points" with scripted responses to use when members and providers called in to inquire
23  about the status and reasons for unpaid claims. These talking points were designed to
24  mislead, conceal, and generally avoid disclosing to members and providers that their
25  claims were pended because of the blanket SIU "audit" to which all OON BH/SUD
26  claims were being subjected. The talking points included vague and dishonest answers
27  to questions about the status of pending/unpaid claims and the reason such claims had
28  not been processed or paid, instructing employees to respond to such inquiries by

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

claiming that Health Net needed additional documents to process the claim, and that claims were being or would be processed upon receipt of the additional, pretextual information/documents.

56.     In reality, these claims were not being and would not be processed. Internal company emails from June 2016 explicitly instructed personnel to immediately stop processing all OON BH claims until further notice and focus solely on processing claims for lab and toxicology services – a substantial number of which were denied or underpaid. Defendants also developed a scheme to conceal Health Net's under-reserved substance use disorder treatment claims by introducing certain claims procedures that assured none of Plaintiffs' claims were paid. In May and June 2016, without any changes in the applicable Health Net policy language, Defendants revised the claims handling manual guideline to specifically provide that Plaintiffs' claims were not paid at a percentage of the billed amount but, instead, at a significantly lower amount based on a Medicare percent conversion factor. To conceal the new procedures, neither policyholders nor providers were given notice of these changes in claims processing. Not paying the 75% or 100% reimbursement rate, and instead using the Medicare rate, was a component of Defendants' fraudulent scheme to retroactively resolve the financial problems caused by their own "plan design flaws."

57.     Optum began working with Health Net's SIU as early as 2012, and in 2015, Health Net and Optum expanded Optum's SIU work to include medical necessity reviews of substance abuse claims on prepayment review. In January 2016, and again in March 2016, Optum's involvement with Health Net's and Centene's SIU departments expanded to the industry-wide fraud investigation into behavioral health and substance use disorder providers, a project that spanned from early January 2016 through the end of February 2017. Optum helped Health Net develop and improve its prepayment review process and develop a reimbursement methodology for claims that otherwise required reimbursement at 75% or 100% of billed charges pursuant to the applicable policy.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

15

THIRD AMENDED COMPLAINT

KANTOR & KANTOR LLP
19839 Northoff Street
Northridge, California 91324
(818) 886 2525

58.     In addition, Optum helped Health Net and Centene manufacture evidence to support their false accusations against Plaintiffs and provide post-hoc justification for Health Net's predetermined refusal to pay claims for reimbursement submitted by Plaintiffs and other drug abuse and behavioral health providers. Specifically, Defendants, including Optum, interviewed Plaintiffs' former employees. During those interviews, Defendants falsely accused Plaintiffs of a variety of unlawful, unethical and immoral conduct for the purpose of inducing witnesses to, essentially, gossip, including (1) opening facilities just to make money; (2) billing insurance companies for services that were not provided; (3) double billing for services provided; (4) using employees in India to create charts and medical records for patients; (5) pressuring employees to treat patients at a higher level of care than was medically indicated; (6) pressuring employees to alter patient diagnoses; (7) allowing patients to get pregnant in treatment and then kicking them out; and (8) "human trafficking" by trading patients.

59.     Defendants also exaggerated, mischaracterized, and falsely recorded the substance of interviews. For example, Defendants falsely recorded that at least one witness said Dr. Tonmoy Sharma, Plaintiffs' then-CEO, was a flight risk and that he had threatened a witness. In addition, Optum, on behalf of Defendants, offered to pay the claims of other out-of-network substance abuse providers if they provided "evidence" against Sovereign to support Defendants' false accusations.

60.     Defendants also spoke to other health insurance companies to "collaborate" on the false accusations Defendants were making against Plaintiffs. Defendants shared this false information in an effort to convince other health insurance companies to stop paying claims submitted by Plaintiffs. Optum specifically participated in this "collaboration."

61.     Optum hired unqualified medical providers to conduct "medical necessity" reviews of certain claims. These providers did not meet the written standards set by Health Net. The providers were given a list of language to insert in their reviews to deny the claims. They did not speak to the patients or to anyone at Sovereign. They accessed

THIRD AMENDED COMPLAINT

certain, unknown medical records electronically but did not confirm or inquire as to whether the records were complete. The providers applied outdated guidelines created by a third-party vendor and did not know or inquire as to whether these guidelines were consistent with the applicable plan or policy language.

62.     After the providers finished their reviews, Dr. Matthew Wong of Health Net signed off on the reviews, without speaking with the providers or conducting any review of his own. Health Net sent out denial letters based on these reviews and signed Dr. Wong's name on those letters, without his prior knowledge.

63.     Denial letters alleging lack of medical necessity were sent with the signature of SIU Director, Ciganek, without his prior knowledge. Defendants knew, or should have known, that Ciganek had no medical background or training and that it would be inappropriate to have his name associated with the denial of a claim based on lack of medical necessity.

64.     Defendants knew that they were obligated to pay the outstanding claims unless they were able to discredit Plaintiffs and/or force them out of business. In late 2016, Defendants initiated multiple meetings with law enforcement and regulatory entities in an attempt to convince them to institute criminal proceedings against Plaintiffs.

65.     Defendants repeated their blatantly false allegations, telling these entities:

        a.      Plaintiffs were treating Health Net patients and "dumping" them on the street when insurance coverage was denied.

        b.      Plaintiffs were about to close their facilities.

        c.      Dr. Tonmoy Sharma was about to flee the country.

        d.      Plaintiffs were using "cappers" and "runners" to solicit patients.

66.     Defendants met with the District Attorney in Los Angeles and Orange County, as well as the California Department of Insurance, all of whom refused to act on Defendants' allegations. Determined to have criminal proceedings initiated against Plaintiffs, Defendants created a Power Point presentation in which Defendants: falsely

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

17

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

accused Plaintiffs of the manufactured conduct described above; suggested "targets" for criminal investigation; misrepresented the contents of interviews; and, suggested legal theories for criminal prosecution, including violations of: 18 U.S.C. § 24 — Definitions Relating To Federal Health Care Offense; 18 U.S.C. § 371 — Conspiracy To Commit Offense Or To Defraud United States; 18 U.S.C. § 1035 — False Statements Relating To Health Care Matters; 18 U.S.C. § 1341 — Frauds And Swindles; 18 U.S.C. § 1347 — Health Care Fraud; California Penal Code § 186.10 — Money Laundering Elements Violations Punishment Pleadings; California Penal Code § 487 - Grand Theft Defined; California Penal Code § 530.5 - Unauthorized Use Of Personal Identifying Information Of Another Person; California Penal Code § 550 - False Or Fraudulent Claims Or Statements Prohibited Acts.

67.    Defendants presented this Power Point to the FBI and the U.S. Attorney in Orange County.

68.    At all times in their communications with the FBI and the U.S. Attorney's Office, Defendants presented themselves as nonpartisans relative to Plaintiffs.

69.    In fact, Defendants were actively involved in civil litigation with Plaintiffs in a lawsuit in which Plaintiffs alleged Defendants had wrongfully refused to pay approximately $65M in claims.

70.    Health Net's counsel in that case, Ken Julian, stated on the record that his firm was hired  to "secure an indictment" against Sovereign.

71.    Defendants never disclosed to the FBI or U.S. Attorney that they were involved in contentious litigation with Plaintiffs, or that they were currently defending against claims of tens of millions of dollars brought by Plaintiffs.

72.    Defendants knew the execution of a search warrant on plaintiffs' treatment facilities and threatened criminal prosecution would disrupt plaintiffs' operations and ongoing business.

73.    Defendants knew or had reason to know that the quality of information they had obtained and presented to the FBI/authorities was insufficient to justify a search of

THIRD AMENDED COMPLAINT

plaintiffs' facilities and was insufficient to constitute a violation of the federal and state laws that Defendants, during their presentation, alleged Plaintiffs had violated, including those listed *supra*, ¶ 66. Lee Arian, VP of Advisory Services for Optum, previously worked as an assistant U.S. attorney. Optum contracted with former FBI agent, Mark Botello, to conduct various interviews of former Sovereign employees and patients. Mr. Botello was one of several investigators for Defendants who used improper interview techniques designed to elicit allegations about Sovereign to use in Defendants' presentation to authorities, and who reported in interview summaries that witnesses made damaging allegations about Sovereign that, according to later deposition testimony, misstated the witness statements. Botello's and other investigators' interview summaries were included in the presentation given to the FBI, U.S. Attorney's Office, and other authorities. The presentation was given by Health Net's counsel, Ken Julian – a former Assistant U.S. Attorney (AUSA), who worked in the same Orange County office as the AUSA in his audience during the presentation; Centene's SIU director, Daniel Kreitman – a former law enforcement officer; and Centene's regional manager, Haley Fisher, a senior investigator for Centene's SIU and also an attorney.

74.   Kreitman never concluded Sovereign's operation was fraudulent, yet Defendants presented information to the FBI in support of fraud allegations that they knew was not accurate, well-founded, or supported by evidence. Defendants included allegations they based on speculation without evidence, and presented certain evidence they knew was mere speculation. Defendants omitted any exculpatory evidence from the presentation and subsequent information shared with authorities.

75.   In support of their fraud allegations presented to authorities, Defendants relied on witness interviews of former Sovereign employees and patients—conducted by Optum's, Health Net's and Centene's SIU investigators—that consisted of rumors and innuendo and which Defendants knew were speculative, unfounded, not credible, or not evidence of actual wrongdoing.  To support their allegations of "false billing," for example, Defendants cited the SIU interview of Pam Krueger, a former Sovereign

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

KANTOR & KANTOR LLP
19839 Northoff Street
Northridge, California 91324
(818) 886 2525

employee, as evidence of "Sharma directing staff to bill for services not rendered." Defendants omitted the fact that Ms. Krueger told the investigator that she did not know this from personal knowledge, but heard it from another person who was not cited in the presentation. Defendants cited Christina Khouie's SIU interview to support their allegation that Dr. Sharma was a "flight risk," omitting that Ms. Khouie had corrected the misstatement that Defendants presented to support this allegation. The other witness statements Defendants cited in their presentation suffered from similar omissions, comprising a record Defendants knew was misleading.

76.

77.    On the morning of June 13, 2017, based on the misrepresentations presented by Defendants, more than 100 armed guards from the FBI, U.S. Department of Health and Human Services, IRS, DHCS, and several other agencies, simultaneously executed search warrants at six Sovereign locations across southern California and the home of Dr. Tonmoy Sharma. Mental health patients and others recovering from substance abuse addiction, as well as their counselors, medical care providers, and Sovereign employees, were physically escorted from their rehabilitative activities and ordered to line up while government agents seized business and personal documents. Agents, some with weapons drawn, immediately separated patients from employees, confining employees to conference rooms and lobbies and forcing patients, many suffering from PTSD and anxiety, to stand outside with armed agents. Patients and employees were searched and interrogated; cell phones were confiscated.

78.    Agents and other individuals identifying themselves to patients as being "with" the agents sowed discontent by repeatedly warning patients that Sovereign would not be in business for long, encouraging patients to seek out alternative care facilities, and even handing out business cards and brochures referring mental health patients to competing mental health and substance abuse providers who are not licensed to provide mental health treatment.

THIRD AMENDED COMPLAINT

79.     The agents provided copies of search warrants for each location. The warrants indicate that they were issued under seal, and that they were signed from 2:30 PM to 3:30 PM the day before the raid. The affidavit supporting each of the warrants, which remains under seal, was not provided. Each of the warrants states that the agents were authorized to seize only evidence of violations of certain federal statutes, including the federal Wire Fraud statue (18 U.S.C. § 1343) – a statute expressly listed in Health Net's cross-complaint – and the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b)— a statute Health Net's fraud allegations appear to be patterned after (although Plaintiffs did not take Medicare or Medicaid) and relied upon in Health Net's motion for summary adjudication of its fraud affirmative defense in the civil case pending in state court.

80.     Moreover, the warrants authorized seizure of records strikingly similar to those sought by Health Net in its civil discovery requests, which were issued in March 2017. The warrants and Health Net requests, for example, authorized seizure of documents and requested discovery (respectively) for the same temporal range, and the categories of documents the government was authorized to seize track closely with the allegations in Health Net's civil cross-complaint filed in February 2017 and the types of records Health Net has sought through discovery.

81.     Upon information and belief, the FBI did not conduct an independent investigation prior to conducting the raid, instead relying on the false and misleading information provided by Defendants in deciding to conduct the raid and the application and affidavits for the search warrant.

82.     In August 2017, Plaintiffs filed a motion to unseal the application and affidavits supporting the search warrants relating to the raid, issued on June 12, 2017. The motion was denied.

83.     Defendants ultimately achieved their desired result: Over one hundred patients left treatment on the day of the raid.

84.     Immediately thereafter, Plaintiffs' bank forced them to close their accounts.

THIRD AMENDED COMPLAINT

85.    In furtherance of their goal to put Plaintiffs out of business, Defendants arranged to have a reporter at the raid, who published articles in local newspapers, repeating Defendants' false allegations. These false allegations were picked up and repeated by various other news outlets, destroying Plaintiffs' reputation.

86.    The raid and attendant media coverage had predictable effects, traumatizing Sovereign patients and employees and severely damaging Sovereign's reputation. In the weeks following the raid, at least sixty-eight patients left Sovereign facilities specifically as a result of the raid, while others declined to seek treatment from Sovereign. During the same period, numerous Sovereign employees resigned or sought medical leave due to anxiety caused by the search. A number of entities who had historically referred patients to Sovereign, including universities, hospitals, specialty care providers, specialists, and other treatment providers, suspended their referrals. Sovereign's primary bank, Bank of America, informed Sovereign that its accounts would be closed within 30 days. In some cases, Sovereign's operations were disrupted or slowed because clinical staff treating patients lacked necessary files and documents and had to secure replacements for their seized laptops and cell phones, or find ways to work without them.

87.    The financial harms and damages inflicted on Plaintiffs' business were compounded by the substantial time and expense Plaintiffs expended in attempting to recover millions of dollars in reimbursement from Defendants for services Plaintiffs rendered on their insureds, and the substantial time and expense Plaintiffs expended in responding to Defendants' unreasonable demands for voluminous documents on claims they had already decided not to pay for pretextual reasons.

88.    Consequently, Plaintiffs ultimately could not afford to pay their employees and were forced to close all nine of their facilities and layoff nearly 1,200 employees.

## CA DOI ORDERS HEALTH NET TO SHOW CAUSE

89.    On June 23, 2017, the DOI issued an Order to Show Cause ("OSC") to Health Net, stating that it had received hundreds of complaints from out-of-network substance use disorder providers about Health Net's handling of claims for treatment of

THIRD AMENDED COMPLAINT

Health Net policyholders. The OSC alleges that Health Net's refusal to honor the policy language, requiring reimbursement at 75% of billed charges, evidences unfair claims practices, violations of the Mental Health Parity Act, and unfair and/or deceptive act of practices in violation of California Insurance Code Section 790.03.

90.     Plaintiffs are informed and believe that Defendants misrepresented to the DOI that it was resolving the claims of the out-of-network substance use disorder treatment providers. In truth, Defendants have refused and failed to do so with respect to Plaintiffs and others who have rightfully exercised their rights, as assignees of Health Net policyholders, to pursue payment of the outstanding claims. In August 2017, the California DOI withdrew the OSC.

91.     On July 24, 2018, however, the DOI issued a new OSC alleging that Health Net's refusal to honor its policy language violates the law. The DOI stated that Health Net's referral of all claims to its SIU unit "directly upon receipt of the claims payment request, prior to performing a reasonable review of the claim" and placing providers "on an audit list and then require[ing them] to prove that they should be removed from the list before any payment was made" "resulted in illegitimate denials and delayed payment of claims" and "***is an unreasonable standard for the investigation and processing of claims***."

92.     On January 6, 2019, Health Net settled with the DOI for $1,025,000.

## FIRST CAUSE OF ACTION

## VIOLATION OF RICO, 18 U.S.C. § 1962(c)

93.     Plaintiffs incorporate by reference all paragraphs alleged above.

94.     Each of the Defendants is a "person" within the meaning of 18 U.S.C. § 1961(3).

95.     Each of the Defendants together constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and are referred to herein as "the enterprise."

96.     As alleged above, each of the Defendants has repeatedly and systematically conducted and participated, directly and indirectly, in the conduct of the affairs of the

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

THIRD AMENDED COMPLAINT

enterprise through a pattern of "racketeering activity" consisting of two or more predicate acts in furtherance of the above-described fraudulent scheme, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

97.     Pursuant to and in furtherance of their fraudulent scheme, each of the Defendants knowingly and willfully used and caused to be used the United States mail and/or interstate wires to commit multiple acts, including:

a.     Conducting an unfounded and fraudulent audit of legitimate claims for treatment of Health Net policyholders submitted by Plaintiffs and other out of network mental health and substance use disorder providers;

b.     "Pending" indefinitely the review of legitimate claims for the treatment of Health Net policyholders, without a good faith investigation into whether the claims were covered by the applicable policy, and without informing Plaintiffs or the policyholders of the status of those claims;

c.     Failing and refusing to pay legitimate claims for treatment of Health Net policyholders submitted by Plaintiffs on the ground that a referral fee was paid for the placement of the policyholder, without a legitimate basis for using the payment of a referral fee as an excuse for failing to pay a claim, without a good faith investigation into whether the claims were covered by the applicable policy, and without informing Plaintiffs or the policyholders of the status of those claims;

d.     Failing and refusing to pay Plaintiffs' legitimate claims for treatment of Health Net policyholders absent proof that the patients first paid amounts that they were not required to pre-pay and/or that could not be determined until Health Net paid the legitimate claims;

e.     Failing and refusing to pay Plaintiffs' legitimate claims for treatment of Health Net policyholders on the grounds that premiums were paid by Plaintiffs or third parties, despite no ban on third party payment of premiums in the applicable policies or under the law;

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

f.     Offering to pay the claims of other out-of-network substance abuse providers if they offered "evidence" against Plaintiffs;

g.     Contacting other insurance companies to share false accusations and encourage them to stop paying Plaintiffs' claims;

h.     Using an inappropriate and unlawful calculation for the amount owed on paid claims;

i.     Falsely reporting to law enforcement that Plaintiffs had engaged in unlawful conduct;

j.     Falsely reporting to law enforcement that Plaintiffs' principal was a flight risk;

k.     Interfering with the payment of Plaintiffs' legitimate claims for patients who did not have Health Net policies.

l.     Persisting in its refusal to pay thousands of valid and covered claims after and despite DOI's findings described above and Defendants' representations to DOI that it was resolving these claims.

98.     Defendants used or caused to be used the United States mail and/or interstate wires in creating, implementing, and concealing from Plaintiffs a blanket policy of denying, permanently "pending" and refusing to pay, and underpaying valid and covered claims of a certain type or from certain providers including Plaintiffs without any investigation into the merits of such claims by, for example:

a.     Mailing letters to Plaintiffs, patients, and other providers with boilerplate language misrepresenting Defendants' rationale for investigating and/or refusing to pay claims, the purpose of which was to mislead and conceal Defendants' fraudulent scheme and the wrongful policies described above, and misrepresenting that the letters complied with applicable law and regulations;

b.     Distributing claims handling guidelines to claims personnel outlining the blanket policies of denying, underpaying, refusing to pay, and referring to SIU claims of a certain type or from certain providers, including Plaintiffs, without

THIRD AMENDED COMPLAINT

independently investigating the merits of such claims or the validity of any accusations against Plaintiffs;

c.      Sending claims and medical records to Optum to conduct inadequate and fraudulent medical reviews to manufacture support for the knowingly wrongful refusal to pay claims that were valid and covered; and

d.      Affixing Dr. Matthew Wong's signature to denial letters with his knowledge, and sending the letters through mail or electronic mail, to Plaintiffs and their Health Net patients.

99.     The enterprise's fraudulent scheme, as described above, has continued for a substantial period and is ongoing. It began in 2015 and continues today, five years later, thus amounting to continuing fraudulent activity and posing a threat of such fraudulent activity continuing into the future. Further, these acts demonstrate Defendants' ongoing and regular way of doing business.

100.    The enterprise is engaged in, and its activities affect, interstate commerce.

101.    As a direct and proximate result of the above-described pattern of racketeering activity, the enterprise damaged Plaintiffs in an amount to be proven at trial by causing Plaintiffs to expend substantial resources in their efforts to comply with and respond to Defendants' baseless and unreasonable demands for voluminous records regarding claims Defendants had already decided to deny for predetermined pretexts; forcing Plaintiffs to expend further resources on attorneys' fees and to combat Defendants' smear campaign against Plaintiffs through the media; and forcing Plaintiffs to close their operations.

102.    Plaintiffs are entitled to an injunction requiring each of the Defendants to cease the conduct alleged in this cause of action, treble damages, costs of litigation, and reasonable attorney fees pursuant to 18 U.S.C. § 1964 and applicable law.

## SECOND CAUSE OF ACTION

## CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)

103.    Plaintiffs incorporate by reference all paragraphs alleged above.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

104. Each of the Defendants is a "person" within the meaning of 18 U.S.C. § 1961(3).

105. Each of the Defendants together constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and are referred to herein as "the enterprise."

106. The enterprise engaged in a pattern of "racketeering activity" consisting of two or more predicate acts in furtherance of the above-described fraudulent scheme, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

107. Each of the Defendants deliberately joined "the enterprise" with knowledge of its purpose.

108. Pursuant to and in furtherance of their fraudulent scheme, each of the Defendants knowingly and willfully agreed that "the enterprise" would be used or cause to be used the United States mail and/or interstate wires to commit multiple acts, including

a. Conducting an unfounded and fraudulent audit of legitimate claims for treatment of Health Net policyholders submitted by Plaintiffs and other out of network mental health and substance use disorder providers;

b. "Pending" indefinitely the review of legitimate claims for the treatment of Health Net policyholders, without a good faith investigation into whether the claims were covered by the applicable policy, and without informing Plaintiffs or the policyholders of the status of those claims;

c. Failing and refusing to pay legitimate claims for treatment of Health Net policyholders submitted by Plaintiffs on the ground that a referral fee was paid for the placement of the policyholder, without a legitimate basis for using the payment of a referral fee as an excuse for failing to pay a claim, without a good faith investigation into whether the claims were covered by the applicable policy, and without informing Plaintiffs or the policyholders of the status of those claims;

d. Failing and refusing to pay Plaintiffs' legitimate claims for treatment of Health Net policyholders absent proof that the patients first paid amounts that

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

THIRD AMENDED COMPLAINT

they were not required to pre-pay and/or that could not be determined until Health Net paid the legitimate claims;

e. Failing and refusing to pay Plaintiffs' legitimate claims for treatment of Health Net policyholders on the grounds that premiums were paid by Plaintiffs or third parties, despite no ban on third party payment of premiums in the applicable policies or under the law;

f. Offering to pay the claims of other out-of-network substance abuse providers if they offered "evidence" against Plaintiffs;

g. Contacting other insurance companies to share false accusations and encourage them to stop paying Plaintiffs' claims;

h. Using an inappropriate and unlawful calculation for the amount owed on paid claims;

i. Falsely reporting to law enforcement that Plaintiffs had engaged in unlawful conduct;

j. Falsely reporting to law enforcement that Plaintiffs' principal was a flight risk; and

k. Interfering with the payment of Plaintiffs' legitimate claims for patients who did not have Health Net policies.

109. The enterprise's fraudulent scheme, as described above, has continued for a substantial period and is ongoing.

110. The enterprise is engaged in, and its activities affect, interstate commerce.

111. As a direct and proximate result of the above-described pattern of racketeering activity, the enterprise damaged Plaintiffs in an amount to be proven at trial by causing Plaintiffs to expend substantial resources in their efforts to comply with and respond to Defendants' baseless and unreasonable demands for voluminous records regarding claims Defendants had already decided to deny for predetermined pretexts; forcing Plaintiffs to expend further resources on attorneys' fees and to combat

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

Defendants' smear campaign against Plaintiffs through the media; and forcing Plaintiffs to close their operations.

112. Plaintiffs are entitled to an injunction requiring each of the Defendants to cease the conduct alleged in this cause of action, treble damages, costs of litigation, and reasonable attorney fees pursuant to 18 U.S.C. § 1964 and applicable law.

<u>**THIRD CAUSE OF ACTION**</u>

**INTENTIONAL INTERFERENCE WITH**

**PROSPECTIVE ECONOMIC ADVANTAGE**

113. Plaintiffs incorporate by reference all paragraphs alleged above.

114. Beginning in 2013, Plaintiffs had an economic relationship with Health Net policyholders who exercised their right to use their out-of-network benefit to obtain mental health and substance use disorder treatment. Pursuant to that relationship, Plaintiffs provided treatment to those patients and billed Health Net for that treatment. Defendants were aware of Plaintiffs' economic relationship with Health Net policyholders.

115. In late 2015 or early 2016, Defendants decided that they wanted to discourage policyholders from exercising their rights to utilize their out-of-network benefits to obtain behavioral health treatment from Plaintiffs. In addition, Defendants wanted to avoid the requirements of Health Net's policy designs. To accomplish these goals, Defendants engaged in the following unlawful acts, among others, designed to disrupt the relationship between Plaintiffs and Health Net policyholders:

a. Defendants "pended" and referred all claims submitted by Plaintiffs to Defendants' Special Investigations Unit, prior to performing a reasonable review of the claim. This conduct is an unreasonable standard for the investigation and processing of claims, in violation of California Ins. Code § 790.03(h)(3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

b. Health Net sent Plaintiffs letters stating that payment of claims was contingent on submission of extensive documentation and attestation of certain

THIRD AMENDED COMPLAINT

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

facts, many of which were irrelevant to the processing of the claims. This conduct constituted an unlawful failure to conduct and diligently pursue a thorough, fair and objective investigation of claims and resulted in unreasonable delays and denial of legitimate claims, in violation of California Ins. Code §790.03(h)(3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

c.     Defendants refused to pay claims based on the clear policy language, which required reimbursement at 75% or 100% of billed charges, but instead substituted a bundled per diem Medicare rate for an entirely different service furnished by an entirely different type of facility. This conduct was a misrepresentation of the applicable policy language and resulted in underpayment and unfair processing of claims, in violation of California Ins. Code § 790.03(h) (3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

d.     Defendants refused to pay any amount on the vast majority of claims submitted by Plaintiffs, despite the fact that the treatment had been authorized, was properly provided and was medically necessary, in violation of California Ins. Code § 796.04.

e.     Defendants falsely accused Plaintiffs of illegal conduct, damaging the good name and reputation of Plaintiffs, and causing Health Net policyholders and others to stop seeking treatment from Plaintiffs.

f.     Defendants reached out to other insurance companies, shared their false accusations, and encouraged them to stop paying claims submitted by Plaintiffs.

g.     Defendants' conduct was targeted at behavioral health providers, not providers of medical/surgical benefits, in violation of Federal Mental Health Parity and Addiction Equity Act of 2008, and the California Mental Health Parity Act, California Ins. Code §§ 10112.27(a)(2)(D) and 10144.4.

116.   As a direct result of the conduct of Defendants, Plaintiffs were unable to continue treating Health Net policyholders.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

THIRD AMENDED COMPLAINT

117.   In 2018, as a further direct result of the conduct of Defendants, Plaintiffs were unable to sustain their operations, and were forced to close their treatment facilities.

118.   Plaintiffs have been damaged in an amount to be determined at trial, but which exceeds $625,000,000.00.

119.   Defendants' conduct, described herein, was intended to cause injury to Plaintiffs or was carried out with a willful and conscious disregard of the rights of Plaintiffs, subjected Plaintiffs to cruel and unjust hardship in conscious disregard to its rights, and was an intentional misrepresentation, deceit, or concealment of a material fact known to Defendants with the intention to deprive Plaintiffs of property, legal rights, or to otherwise cause injury, such as to constitute malice oppression or fraud under California Civil Code section 3294, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants.

## FOURTH CAUSE OF ACTION

### VIOLATION OF UNFAIR COMPETITION LAW,

### BUSINESS AND PROFESSIONS CODE §17200

120.   Plaintiffs incorporate by reference all paragraphs alleged above.

121.   Defendants' conduct, as set forth above, was unlawful, unfair and constitutes fraudulent business practices or acts.

122.   Defendants engaged in the following unlawful, unfair and fraudulent conduct, among others:

a.   Defendants "pended" and referred all claims submitted by Plaintiffs to Defendants' Special Investigations Unit, prior to performing a reasonable review of the claim. This conduct is an unreasonable standard for the investigation and processing of claims, in violation of California Ins. Code § 790.03(h)(3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

b.   Defendants sent Plaintiffs letters stating that payment of claims was contingent on submission of extensive documentation and attestation of certain facts, many of which were irrelevant to the processing of the claims. This conduct

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

THIRD AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

constituted an unlawful failure to conduct and diligently pursue a thorough, fair and objective investigation of claims and resulted in unreasonable delays and denial of legitimate claims, in violation of California Ins. Code §790.03(h)(3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

c.    Defendants refused to pay claims based on the clear policy language, which required reimbursement at 75% or 100% of billed charges, but instead substituted a bundled per diem Medicare rate for an entirely different service furnished by an entirely different type of facility. This conduct was a misrepresentation of the applicable policy language and resulted in underpayment and unfair processing of claims, in violation of California Ins. Code § 790.03(h) (3) & (5) and §10123.13, and Cal. Code of Regs., tit. 10, § 2695.7(d).

d.    Defendants refused to pay any amount on the vast majority of claims submitted by Plaintiffs, despite the fact that the treatment had been authorized, was properly provided and was medically necessary, in violation of California Ins. Code § 796.04.

e.    Defendants' conduct was targeted at behavioral health providers, not providers of medical/surgical benefits, in violation of Federal Mental Health Parity and Addiction Equity Act of 2008, and the California Mental Health Parity Act, California Ins. Code §§ 10112.27(a)(2)(D) and 10144.4.

123.   As a direct and proximate results of Defendants' unlawful, fraudulent and unfair business practices, Plaintiffs have suffered and will continue to suffer substantial monetary losses and irreparable injury. Plaintiffs do not have an adequate remedy at law and will continue to suffer irreparable harm if an injunction does not issue ordering Defendants to stop their unlawful, fraudulent and unfair business practices. Plaintiffs are entitled to an injunction under California Business and Professions Code § 17203.

124.   Defendants have been unjustly enriched by their unlawful, fraudulent and unfair business practices. Plaintiffs seek restitution in an amount to be proved at trial.

**FIFTH CAUSE OF ACTION**

**SLANDER PER SE**

125.   Plaintiffs incorporate by reference all paragraphs alleged above.

126.   In or about December 2016, Defendants communicated and/or met with representatives from other health insurance carriers, including Anthem and Cigna. In those communications and/or meetings, Defendants made statements that falsely accused Plaintiffs of illegal and unethical business conduct. These statements constitute slander *per se* under California Civil Code § 46 (1) and (3).

127.   Defendants did not fully reveal these private communications until October 2019.

128.   As a direct result of the conduct of Defendants, Plaintiffs were unable to sustain their operations, and were forced to close their treatment facilities. As a result, Plaintiffs have been damaged in an amount to be determined at trial, but which exceeds $625,000,000.00.

129.   Defendants' conduct, described herein, was intended to cause injury to Plaintiffs or was carried out with a willful and conscious disregard of the rights of Plaintiffs, subjected Plaintiffs to cruel and unjust hardship in conscious disregard to its rights, and was an intentional misrepresentation, deceit, or concealment of a material fact known to Defendants with the intention to deprive Plaintiffs of property, legal rights, or to otherwise cause injury, such as to constitute malice oppression or fraud under California Civil Code section 3294, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.   Damages in an amount to be determined at the time of trial but in excess of $625,000,000, plus interest, including prejudgment interest;

2.   General damages and other incidental damages;

3.   Treble damages under RICO;

THIRD AMENDED COMPLAINT

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

1    4.    Punitive and exemplary damages in an amount in excess of $500,000,000;

2    5.    Injunctive relief requiring Defendants to ease engaging in unlawful, unfair

3   and fraudulent business acts and practices;

4    6.    Reasonable attorney fees as allowed by law;

5    7.    Costs of suit incurred herein; and

6    8.    Such other and further relief as the Court deems just and proper.

7   Dated:  May 28, 2021          **KANTOR & KANTOR, LLP**
8                                  LISA S. KANTOR
                                   TIMOTHY J. ROZELLE

9                                  **DAWSON & ROSENTHAL, P.C.**
10                                 STEVEN C. DAWSON
                                   ANITA ROSENTHAL
                                   SANDER DAWSON
11
12   By:___*/s/ Lisa S. Kantor*_____
                                   Lisa S. Kantor,
13                                 Attorneys for Plaintiffs, Dual Diagnosis
                                   Treatment Center, Inc., Satya Health of
14                                 California, Inc., Adeona Healthcare, Inc.,
                                   Sovereign Health of Florida, Inc., Sovereign
15                                 Health of Phoenix, Inc., Sovereign Health of
                                   Texas, Inc, Shreya Health of Florida, Inc.,
16                                 Shreya Health of Arizona, Inc., Vedanta
                                   Laboratories, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

THIRD AMENDED COMPLAINT

# **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

Dated:  May 28, 2021          **KANTOR & KANTOR, LLP**
LISA S. KANTOR
TIMOTHY J. ROZELLE

**DAWSON & ROSENTHAL, P.C.**
STEVEN C. DAWSON
ANITA ROSENTHAL
SANDER DAWSON

By:___*/s/ Lisa S. Kantor*_____
Lisa S. Kantor,
Attorneys for Plaintiffs, Dual Diagnosis
Treatment Center, Inc., Satya Health of
California, Inc., Adeona Healthcare, Inc.,
Sovereign Health of Florida, Inc., Sovereign
Health of Phoenix, Inc., Sovereign Health of
Texas, Inc, Shreya Health of Florida, Inc.,
Shreya Health of Arizona, Inc., Vedanta
Laboratories, Inc.

KANTOR & KANTOR LLP
19839 Nordhoff Street
Northridge, California 91324
(818) 886 2525

THIRD AMENDED COMPLAINT